## G. R. McALISTER v. ECLIPSE OIL COMPAMY.

No. 7101.　Decided November 12, 1936.
Rehearing overruled January 13, 1937.
(98 S. W., 2d Series, 171.)

*M. L. Lefler* and *E. B. Votaw*, both of Beaumont, for plaintiff in error.

This suit being for the purpose of cancelling stock of the oil company, issued to defendant, on the ground that it was void because he paid no consideration for it, the duty rested upon the oil company to prove that the lease which McAlister traded to the company for the stock had no value or was of such insignificant value as to constitute fraud on its face. And if the consideration thus paid was not adequate, plaintiff's remedy was a suit for the difference between what he paid and the value of the stock, and not a suit for cancellation. Thomason v. Miller, 4 S. W. (2d) 668; Associated Oil Co. v. Thompson, 289 Fed., 693; Pruitt v. Westbrook, 11 S. W. (2d) 562; Pacific American Gasoline Co. v. Miller, 76 S. W. (2d) 833.

*W. D. Gordon* and *E. E. Easterling*, both of Beaumont, for defendant in error.

Since the evidence shows that the corporation at no time, either through its board of directors or stockholders, directly or indirectly approved in any manner the transaction, but expressly repudiated it, whereby the promoters McCall and McAlister, without consideration, issued to themselves, as promotion stock, one-half of the capital stock of the corporation in procuring and transferring said lease to the corporation, therefore, the $10,000 worth of stock certificates held by McAlister constituted an illegal act and was fraudulent and void as between him and the corporation, and the Court of Civil Appeals correctly affirmed the judgment of the trial court in cancelling such stock, as evidenced by the certificates to himself, and in rendering judgment for the recovery of the dividends paid thereon. Strange v. Houston & T. C. Ry. Co., 53 Texas, 162; Turner v. Cattleman's Trust Co., 215 S. W., 833; Washer v. Smyer, 109 Texas, 398, 211 S. W., 985; Tenison v. Patton, 95 Texas, 284, 67 S. W., 92.

MR. JUSTICE CRITZ delivered the opinion of the Court.

This suit was filed in the District Court of Jefferson County, Texas, by Eclipse Oil Company, alleged to be "a corporation organized and existing under the laws of the State of Texas." As finally tried, the Oil Company sought judgment against G. R. McAlister, cancelling stock therein in his name of the par value of $10,000.00. Also, the Oil Company sought a money judgment against McAlister for the sum of $2500.00, with interest. The cancellation of the $10,000.00 of stock was sought on the theory that it was issued without any valid, adequate,

or sufficient consideration, and as a result of an illegal transaction that rendered its issuance void in its incipiency. The money recovery for $2500.00 was sought on the theory that McAlister had received and appropriated dividends in that amount from the Company on the $10,000.00 of stock that he then held in his name, but which in fact he did not really own, and had never really owned. It thus appears that the real question to be decided in this case is whether or not the Company is entitled to a judgment cancelling the $10,000.00 of stock as void when it was issued. If it is not entitled to a judgment cancelling the stock in its incipiency, of course it is not entitled to a recovery of the dividends paid thereon. We do not express an opinion as to the right of the Company to recover the dividends if it could cancel the stock. It is not necessary to decide that question, because, as will later appear, we are of the opinion that the Company is not entitled to cancel the stock.

It appears from the record before us that this case was tried in the district court before a jury, but at the close of the testimony the court peremptorily instructed a verdict that called for a judgment awarding the Oil Company a cancellation of the $10,000.00 stock and a money recovery of $2500.00 with interest. The verdict was returned as instructed, and judgment entered accordingly. McAlister duly appealed to the Court of Civil Appeals at Beaumont, which court in all things affirmed the judgment of the district court. 92 S. W. (2d) 545. McAlister brings error.

In the fall of 1931, G. R. McAlister and one John D. McCall desired to drill an oil well on a tract of 3.7 acres of land in the edge of what is generally known as the Hull Oil Field, in Liberty County, Texas. This land was in practically proven territory. It was shown that there were then two flowing wells on the adjacent land. One of these wells was about 300 feet, and the other about 200 feet, from this land. One of these wells was producing about 800 barrels of oil per day, and the other about 300 barrels. It further appears that the tract of 3.7 acres of land in question was owned by a considerable number of parties, among whom was McAlister, who owned an undivided 1/16 interest.

McAlister and McCall agreed that they would work together to secure a lease on the above 3.7 acres of land, and that when such lease was secured, it would belong to them jointly, each owning an undivided one-half interest. In this connection, it was contemplated at the time that after the lease

was secured, McCall and McAlister would form a corporation to raise money to develop and operate it. McAlister took the lead in securing the lease from the several owners of the land. He did most of the work and bore most of the expenses in accomplishing this result. McCall was a lawyer, and it was agreed that he should handle the legal part of the transactions, such as drawing the charter of the contemplated corporation, etc. Also, McCall was to use his efforts to interest other parties who would buy stock in the contemplated corporation. The proceeds of this stock were to be used to develop the land for oil. Pursuant to the agreements and plans of McAlister and McCall, a lease was finally secured from the owners of the land. The lease, however, was made in the name of McCall as lessee. The name of McAlister appears as a lessor. In this connection, however, it appears that McCall at all times recognized McAlister as the owner of a one-half interest in such lease.

The lease in question was in many respects an ordinary oil and gas lease. It recited a consideration of $10.00 paid, and a further consideration of the "covenants and agreements hereinafter mentioned." It recited that the lessors "hereby grant, lease and let unto the said lessee the tract of land hereinafter described, for the purpose of and with the exclusive right of exploiting the same for, and of producing oil and other minerals therefrom, and to that end also grant the exclusive right of drilling and operating thereon for oil, gas or other minerals, together with rights of way for the right to lay pipe lines to convey water, oil, steam, and gas, and the right to have and use sufficient water, oil, gas and coal from the premises to drill and operate any wells that lessee may drill or bore on the premises, or shaft lessee may excavate on the premises, or in treating, so as to make merchantable, any such minerals produced on the premises; and also such other privileges as are reasonably requisite and necessary for the conduct of said operation, and the right to remove at any time from said premises any and all property which may have been placed thereon by said lessee."

Said lease also contained the following provisions:

"1. Lessee shall commence operations for the drilling of a well upon said premises above described within a period of three months from this date, and shall prosecute such drilling operations with due diligence until the 4265 foot stratum of sand is reached, or until oil in paying quantities is discovered at a lesser depth, or until lessee has spent the sum of Twenty Thousand ($20,000.00) Dollars in an effort to reach producing

sand. The lessee shall have the right to make as many attempts to discover and produce oil on and from said premises as lessee may desire, provided that such operations for the discovery of oil upon said premises shall be continuous in the sense that not more than ninety (90) days shall elapse between the completion or abandonment of any well and the beginning of operations for the drilling of the next succeeding well, and that operations once begun on a well shall be prosecuted continuously and with due diligence until such well is completed or abandoned; and such rights, and the rights hereinafter granted, shall continue for a period of three (3) years from the date hereof, and should oil be discovered in paying quantities on the premises, then this lease shall be in force so. long as oil in paying quantities is produced therefrom. However, should oil be discovered and produced in paying quantities on said premises and thereafter such production fail, lessee shall have the right to resume its efforts to discover and produce oil from said premises agreeable to the terms of this paragraph, even after the expiration of said three (3) year period. Failure to commence operations within three (3) months as above provided, or to carry on such operations as above provided, shall forfeit all rights of lessee hereunder."

The above lease also provided for the payment of a royalty of ⅛ part of the oil saved and produced therefrom. A royalty on casing-head gas was also provided for. Further, the lease provided that lessee should pay at the rate of $100.00 per year for each and every gas well which produced natural gas in paying quantities, where such gas was used off the premises or marketed by the lessee.

The lease contained other provisions common to ordinary leases of its character. We do not deem it necessary to set them out here, or to describe them.

After securing the above lease, it seems that McAlister and McCall took into the deal Y. D. Spell. It was agreed between the three that they would incorporate this company with a capital stock of $40,000.00, all subscribed and all fully paid. Simply stated, it was agreed that McCall and McAlister should each subscribe for $19,500.00 of stock, to be paid by transferring to the corporation the lease above described at a valuation of $39,000.00; and Spell was to subscribe for $1,000.00 of such stock, and was to pay for the same by furnishing the company a certain derrick at a valuation of $1,000.00.

McAlister, McCall and Spell carried out their agreement with each other in all of its details, and pursuant thereto made

application to the Secretary of State of this State for a charter for this corporation. The application showed that the stock of the corporation was fully subscribed and fully paid by the transfer to the corporation of the derrick by Spell, for which he was to receive $1,000.00 in stock, and by the transfer to the corporation of the lease above described, for which McAlister and McCall were each to receive $19,500.00 in stock. In other words, the transactions, affidavits, etc., with the Secretary of State relating to this charter show that its capital stock was to be $40,000.00. This stock was subscribed for: $19,500.00 by McAlister, $19,500.00 by McCall, and $1,000.00 by Spell. Also, such transactions, affidavits, etc., show that such capital was fully paid by the transfer to the company of the above lease at a valuation of $39,000.00 and the furnishing of the above mentioned derrick at a valuation of $1,000.00. In this connection, the application shows that the lease was owned jointly by McAlister and McCall. The charter was duly issued, and the next day the lease was duly assigned and conveyed to the corporation. This assignment recites that, "it being understood that the said Eclipse Oil Company, a corporation, by the acceptance of this lease agrees and obligates itself to carry out all the terms and conditions stipulated and set forth in said lease aforesaid." Also, it appears that Spell furnished to the corporation the derrick, as he had agreed. After the happening of the above events, the three incorporators, who then owned all of the stock of the corporation, and who were all then fully cognizant of everything that had been done, and how each had paid for his stock, organized the company and issued the stock in absolute accordance with their agreements and subscriptions as disclosed to the Secretary of State in the transactions attending the application for and the issuance of the charter.

When the company was organized, and the stock issued as above detailed, McAlister and McCall each reassigned to the corporation $9,500.00 worth of his stock, to be used as treasury stock. They each retained $10,000.00 of the stock. This treasury stock was then offered for sale, and so far as we are able to gather, it was all sold. Some of it sold for money, and some for property, such as the drilling rig and other things proper and necessary to drill an oil well. With this money, drilling rig, etc., a paying oil well was drilled on the lease. Later on the charter of this company was amended, so as to increase its capital stock from $40,000.00 to $45,000.00. This additional $5,000.00 of stock was sold, and the money used to further develop the lease. The company seems to have been successfully

operated for a time. McAlister was made General Manager, and, in all, three producing wells were drilled and operated. In the latter part of 1932 the company declared two dividends, aggregating 25 per cent. McAlister received his part of these dividends in the sum of $2,500.00 on the $10,000.00 of stock held by him.

We here quote the following from the opinion of the Court of Civil Appeals:

"It seems that the new stockholders who had come into the company subsequent to the original incorporation gained control of the company and on December 12, 1933, 'fired' Mc-Alister as manager, and on January 8, 1934, a stockholders' meeting ordered that McAlister's stock be canceled, and that he return to the company the $2,500 which had been paid to him as dividends. The resolution also authorized suit to be instituted against McAlister for cancellation of the stock, recovery of the dividends, etc., and this suit followed.

"By resolution passed at the same time it was recited that McCall had voluntarily returned to the treasury of the company $6,000 worth of his $10,000 in stock, and, further, that McCall had procured the lease and rendered services to the company and was entitled to retain the remaining $4,000 worth of stock which he held, and his title to it was recognized and confirmed.

"The company, in its petition, alleged the facts substantially as above, and further, that 'he (McAlister) simply had such stock issued to him and it stands today on the books of said corporation in his name based upon no valid adequate or sufficient consideration of any nature or kind whatsoever.' And further, 'that the $10,000.00 (stock) allotted to and appropriated by the defendant McAlister at a time when the sole stockholders were himself, said McCall and said Spell, the latter two being at no time chargeable with any acts or conduct in any way prejudicial to the plaintiff, constituted on the part of said McAlister an appropriation of one-fourth (¼) of the capital stock of said corporation without the basis or predicate of any adequate consideration whatsoever and was in fact void of legal right and effect, constituting a fraud in the taking of said stock as against said corporation and its legitimate and bona fide stockholders.' It is further alleged, in substance, that Mc-Alister had collected in dividends $2,500, and that 'in equity and good conscience said money belonged to this corporation as a part of its treasury assets and should be returned as such and judgment rendered against the said defendant therefor.'

"The defendant, by his answer, pleaded a general demurrer and numerous special exceptions. In addition to a general denial, the defendant pleaded specially to the merits that 'this defendant further says that the ten thousand dollars ($10,-000.00) worth of stock in the plaintiff corporation which this defendant now owns and has owned since the corporation was organized was issued to the defendant in accordance with a contract previously entered into between said defendant, the said Y. D. Spell, and the said John D. McCall, as organizers of said defendant corporation, for and in consideration of the assignment by this defendant of his interest in the land and the lease, and further consideration of this defendant's efforts and labor in securing from the other interested parties the lease which is the basis of the capital stock of said corporation, and the plaintiff corporation is now estopped to claim otherwise and is estopped to deny defendant's right to all of said ten thousand dollars ($10,000.00) worth of stock.' "

For further statement of the facts of this case we refer to its opinion. 92 S. W. (2d) 545, supra.

In the brief for the corporation, filed by its counsel in this Court, the following contention is made:

"Since the sole and exclusive evidence of title or right to the lease made to McCall was vested in him purely and expressly in trust for the future corporation, there being no claim that McAlister was other than a verbal, undisclosed party at interest with McCall, the transfer and assignment by McCall to the corporation for the consideration subsequently allowed to him by the corporation, acting through qualified stockholders and directors, eliminated the undisclosed ·parol claim of ·McAlister in that instrument, and whatever consideration was paid to McCall therefor by the corporation when for the first time it acted upon the matter of consideration for such assignment other than the assumption of the obligations of that instrument, which consist of the sole considerations expressed in it, and with which alone it was charged, it took the complete title and transfer without notice of any undisclosed parol or secret agreement between McCall and McAlister, for the reasons:

"(a) That until the entry of the cash stockholders in the organization there were no qualified persons in law representing the corporation to act for it in the transaction, or as to any claim of payment of consideration assertable against it by its promoters; and

"(b) It was neither pleaded nor proved that any person

thus qualified to receive notice for the corporation ever knew of the existence of such claim of a parol, secret or equitable interest by McAlister in the lease contract or its assignment; and, therefore, there being no such pleading or proof, the judgments of the lower courts being against such claim, it is a conclusive presumption that such claim of McAlister for $10,000.00 consideration additional to what appeared in the instrument, and the amount subsequently allowed to McCall by the corporation's officials, is void of legal support."

If we properly interpret the above, it amounts to a contention that the $10,000.00 of stock issued to McAlister and here sought to be cancelled, was void in its incipiency. In this regard it seems that this contention is based upon the further contention that neither McCall nor McAlister took any real title to the lease principally made the basis of the granting of this corporation's charter, but that when such lease was executed and delivered in the name of McCall he simply took a title in trust for "the future corporation." We are unable to follow this line of reasoning. If McAlister had no real interest in this lease, McCall was in the same position. If the issuance of McAlister's stock was void in its incipency, then the same mut be said as to the issuance of McCall's stock. If the issuance of the stock of both McCall and McAlister was void, it must be because their transactions incident to the chartering of this concern were also void. Finally, if all this be true, then the incorporation of this concern was void and it was never chartered, because $39,000.00 of its $40,000.00 of authorized capital stock was never subscribed for and never paid for.

■ As we interpret this record, it shows as a matter of law that McCall and McAlister acquired this lease under a prior parol agreement that they would own it, when so acquired, jointly. It is true that the agreement contemplated that McCall and McAlister would later promote a corporation in which others would be interested and to which the lease would be transferred, but certainly such an agreement did not operate to constitute McCall a trustee for such future corporation in the taking of the lease in his name under the circumstances above detailed. This must be true, because no express trust could be created in favor of the corporation, except by contract, and certainly there was no contract that McCall was to take title to this lease in trust for "the future corporation." The transaction certainly did not constitute a resulting trust, because such a trust arises from the transaction itself and not

from any agreement of the parties. Boehl v. Wadgymar, 54 Texas, 589; Oury v. Saunders, 77 Texas, 278, 13 S. W., 1030. A resulting trust arises, if at all, at the very time the legal title passes. Parker v. Coop, 60 Texas, 111; Gardner v. Rundell, 70 Texas, 453, 7 S. W., 781; Oury v. Saunders, supra. There was nothing in the transaction incident to the taking of this lease that operated to create McCall a trustee for "the future corporation" at the very time the legal title to this lease passed into him. It is evident in this regard that at such time McCall and McAlister could have abandoned their intention to form a corporation, and still their title to the lease would have been unaffected.

■ When the transactions regarding the taking of this lease and the chartering of this corporation are viewed in the light of this entire record, they show, as a matter of law, that McCall and McAlister acquired this lease under the prior parol agreement that it would belong to both jointly. By the consent of both parties, the lease was made in the name of McCall. Under the settled law in this State, when the lease was executed and delivered in the name of McCall, he took a fee simple title to an undivided one-half interest therein and a title in trust for McAlister to the other one-half undivided interest. In other words, while the legal title to the whole lease stood in the name of McCall, the real title belonged one-half to McCall and one-half to McAlister. James v. Fulcrod, 5 Texas, 512, 55 Am. Dec., 743; Gardner v. Rundell, 70 Texas, 453, 7 S. W., 781. The mere description of the lease, which we have already given, demonstrates that it, on its face, in fact, and in law, conveyed valuable property and property rights. When this lease was conveyed to the corporation, it, the corporation, thereby became the legal and beneficial owner thereof, together with the property and property rights represented thereby.

Our Constitution, Section 6, Article 12, provides: "No corporation shall issue stock * * * except for money paid, labor done or property actually received, * * *." In our opinion the lease above described was property within the meaning of the above constitutional provision.

■ According to the undisputed record but three persons took any part in the organization and incorporation of this concern, including the original issuance of its capital stock. These three persons were McCall, McAlister, and Spell. The three persons just named subscribed for all of the concern's capital stock, and certainly, as between themselves, paid for all they

had subscribed for in the way and in the manner they had agreed. All such interested parties were fully cognizant of all that was being done. All three knew that McCall and McAlister were each subscribing for $19,500.00 of the capital stock, and were paying for same by transferring to the corporation the lease above described at a valuation of $39,-000.00. All three knew that Spell was subscribing for $1,000.00 of the capital stock, and was paying for same with the derrick above mentioned. At the times all this occurred no party, other than McCall, McAlister, Spell, the corporation, and the State, had any interest in the matter whatever. Under our authorities the corporation is a legal entity, distinct from its stockholders. In this regard, strictly speaking, the ownership of the corporate assets is vested in the corporation itself and not in its stockholders. Also, strictly speaking, the ownership of the stock does not carry with it the equitable title to the corporate property. This simply means, however, that the stockholders have no right to require the corporation to convey to them the legal title to the corporate property. In a larger or real sense the stockholders of a corporation are the beneficial owners of its corporate properties. 10 Texas Jur., p. 781, par. 153; Yeaman v. Galveston City Co., 106 Texas, 389 (see page 426), 167 S. W., 710 (see page 723). It follows that, under the record we have detailed, when this concern was chartered and the properties above described conveyed to it, it became the corporate owner thereof, but the real or beneficial owners of such property were the three stockholders in the proportion in which they held the stock of the corporation. There were no creditors. Under such a record, as between the stockholders themselves, certainly no one or more of them could have questioned the beneficial interest of any one of the others in the properties of the corporation. All this being true, we are unable to see how the corporation's rights could then rise higher than the rights of all of its beneficial owners, and in this regard there is nothing in this record that would change the status at this time from that which existed at the time it was originally organized and its capital stock originally issued.

■ Finally, as already shown, the three persons who subscribed for all of the capital stock of this corporation were fully cognizant of all that was done in its organization and in the issuance of its charter and capital stock. Also, the Secretary of State was fully apprised of what was being done and how each subscriber and stockholder was paying for his stock. As be-

tween the original parties, there was no concealment and no overreaching. Also, except as to the State, no person or party other than the corporation and the three persons who subscribed for and received all of its capital stock had any interest in this corporation or its corporate affairs. Under such a record we think that, as between each other, neither the corporation itself nor any of its stockholders has any right to say that the issuance of the stock to McAlister was a void transaction in its incipiency. Smith v. Ideal Laundry Co. (Civ. App.), 286 S. W., 285, and authorities there cited; Nenny v. Waddill, 6 Texas Civ. App., 294, 25 S. W., 308, and authorities there cited.

The above holdings determine the result of this case. It is therefore ordered that the judgments of the district court and of the Court of Civil Appeals be both reversed, and judgment be here rendered for McAlister.

Opinion delivered November 12, 1936.

Rehearing overruled January 13, 1937.