DICKENS v. DICKENS et ux.

No. 4793.

Court of Civil Appeals of Texas.
El Paso.

June 20, 1951.

Rehearing Denied July 25, 1951.

Crenshaw & Marbut, Lubbock, Pitts & Liles, Conroe, for appellant.

Benson, Anderson & Howard, Lubbock, for appellees.

McGILL, Justice.

This is an appeal by Mrs. Laura Dickens, hereinafter called appellant, from a judgment of the District Court of Gaines Coun-

660

ty in favor of A. E. Dickens and his wife. A. E. Dickens will be hereinafter referred to as Dickens, and his wife as appellee Mrs. Dickens.

This was an action in trespass to try title in which appellant sought to recover from Dickens and appellee Mrs. Dickens and various other parties an undivided one-half interest in the east one-half of Section 8, Block 31–C, Public School Lands, Gaines County, Texas, containing 320 acres. A jury was empaneled in the case. Dickens and his wife separately pleaded first, not guilty; second, the three years Statute of Limitation; third, the five year Statute of Limitation and fourth, the ten year Statute. The various other defendants pleaded among other things a defense of innocent purchasers for value. At the close of plaintiff's evidence the court sustained a motion of the defendants other than Dickens and his wife for an instructed verdict. At the close of all the evidence a motion for an instructed verdict was made by Dickens and wife and same was sustained. Appellant by this appeal assails only the judgment in favor of Dickens and wife.

Appellant is the mother of Dickens. It was agreed that J. J. Lane and wife, Nora Lane, and J. O. Jones and wife, Sally B. Jones, were the common source of title and all of said parties claim under said common source of title. Appellant was a widow with seven children. Dickens was her eldest son. At the time his claim to title was initiated he was nineteen years of age. On the 18th day of September, 1923, Dickens entered into a contract with J. J. Lane and J. O. Jones to purchase the property involved, the contract being signed by Lane and Jones by their agent, and Dickens signing same in person. The agreed consideration was $12.50 per acre, $4 per acre thereof being a debt to the State of Texas which Dickens obligated himself to pay, and the balance of the consideration of $8.50 per acre bonus to be paid as follows: $320 to be paid in cash, balance as evidenced by nine vendor's lien notes in the sum of $235.56 each, the deed and the deed of trust therein provided for on the part of Dickens to be placed in escrow with the First State Bank of

Seagraves, Texas, and held in said bank until $3 per acre on said land was paid, when deed, together with proper release from the said deed of trust lien and abstract should be delivered to purchaser and the unpaid notes and deed of trust to the sellers. It is further recited that in lieu of cash forfeit to bind the purchase in this contract the purchaser has executed his promissory note in the sum of $320, payable to sellers, due on November 1st next, same to be forfeited should the buyer fail or refuse to carry out his contract. Appellant saw and knew of this contract about the time of the execution thereof. A deed from J. J. Lane and wife and J. O. Jones and wife to Dickens was filed in the Deed Records April 13, 1928. This deed was dated September 18, 1923, but had been held in escrow from on or about that date to April 13, 1928. On December 6, 1933, the grantors in the above described deed executed and delivered to Dickens a release of the vendor's lien securing the deferred payments of the purchase money. On or about January, 1924, appellant and Dickens moved on the premises with the minor brothers and sisters of Dickens. Prior to that time or about that time Dickens had constructed a dugout on the property. In 1928 appellant moved off of the property and since said date has never been in possession thereof.

Dickens was married in 1927, and from the time he moved thereon in 1924 until 1949 has lived on the property. In 1949 he leased the property and has held possession thereof without suit until this suit was filed by appellant on the 16th day of January, 1950.

Appellant claims she acquired and holds equitable title by virtue of a resulting trust arising in substance in the following manner: She testified in substance that the cash payment on the property was made with her funds, that it was paid by a check for $320 drawn on her account by her son. There is evidence raising the issue that there was either an express or implied agreement before the title passed to Dickens, that appellant should have a half interest therein; that the deferred payments would be paid out of the income from the

land. Dickens denied payment was made from appellant's funds, and denied any such agreement.

██ Dickens, with appellant and his brothers and sisters, moved on the property about January, 1924. The property has been farmed continuously since that time down to the date of the filing of this suit. There was evidence that the farm was farmed for the year 1924, that in 1925 the land was farmed by Chaffey, Dickens' brother-in-law; that he rented the land but didn't make much crop; that he gave it to the family; that Dickens was on the farm part of the time in 1926 and helped with some farming that year; that no money was made on the 1926 crop; that the land was farmed in 1927 and crop was made; that Dickens was on the farm part of the time in 1927; that in 1928 appellant and her children other than Dickens farmed the north half of the farm and Dickens farmed the south half; that appellant and the other children had the north half and Dickens and his wife farmed the south half; that they made a crop on the north half; that none of same was used to pay any of the taxes or deferred obligations on the place; that Dickens did not get any of the money appellant made from that crop; that she moved to south Texas when the crop was gathered in 1928, first to Liverpool, Texas, where she lived for two years, then to Karnes County for a year, then to Bee County for about a year; that she returned to Gaines County in 1932; that on returning to Gaines County she lived about three or four miles from the land in controversy; that since she left the property in controversy in 1928 she had never received any money from the farm; that Dickens had been farming the land; that he farmed it until he moved to Colorado in 1948; that he never did send her any money; that he had never accounted to her for any of the profits which might have been made from the farm; that she had a conversation with Dickens at the time she moved off the farm in 1928 about the crops on the place; that he was to work the place "my part on the 3rd and 4th"; that when she left in 1928 she told Dickens to put her part of the crops in on the land notes; that that was the way she would pay it, that what her part of the land made would go in to pay her payment on the land; that after she left she knew Arthur made crops on the land because they sent her an itemized account of the stuff they raised on the land, and by "stuff" she meant crops; that she knew that the money that was received from the crops was paid on the land notes; that she took her son's word for this; that he had never told her at any time that she didn't have any interest in the land; that he told her that when she got it paid for, when it paid for itself that he would give her a deed to it; that she had never received any oil royalties off the property; that she knew there was oil on the property now; that she knew there were now eight wells on the property; that she had never received any money from that. Appellant introduced three letters written by appellee Mrs. Dickens, but written with the authority of Dickens. On September 23, 1929 she wrote appellant and stated in substance that appellant had asked for a deed to her part of the land; that when she had paid up on her part of the land Dickens would make her a deed; that the rent would have paid up things if they had not run over from the year before; that after everything was paid up in the fall there remained due on the place four notes for $235.50 each with interest, and state interest until $5 per acre had been paid, also taxes. December 17, 1929, appellee's wife again wrote appellant in substance that appellant had coming from the place $258.92, that appellant for the year 1929 owed $407.46 which upon deducting the sum of $258.92 left a balance owing by appellant of $148.54; that appellant would have a small additional credit on ungathered corn; that her husband would not make appellant a deed this year unless she paid up the balance of $148.54. On February 7, 1931, appellee's wife wrote appellant: "You wanted to know why we don't make you a deed for that land. You will have to pay for it before you get it, how can you expect to get it payed out so soon and you never do send any money *are* give us in (any) to put on it. How could the rent pay that note a year like this

when people can't make their land notes with all they make. Arthur promised you the land when you payed for it for you a home. I hope you all remember how you done us the year you left, never so much as paid the taxes and work on that land too. Its a wonder you have a claim for we would not have long if we didn't pay our taxes and interest every year. What would be thought of us if we worked all our lifes and put it in a piece of land and deeded it to someone else. You all can make money to pay on land same as us when you pay for it we will both sign you a deed if you do it right. I'm sure it was *faults* about us going to get a car, but if we could that would be our own good luck, but I'm sure you had rather he would pay his and your land notes first for if he was to loose the land him and you both would be left out. When you all get tired of running around I'm sure you would like a home all of your own. So just think of it and get busy and help pay for it. We pay ever cent of the rent but you surely don't expect Arthur to pay all he makes on it. You said the land ought to pay for itself. Well it could some day if you lived on it." These letters, written as they were with the consent of Dickens, we think amount to an admission that appellant had an interest of some sort in the land, an interest that might ripen into full title. They establish, we think, that up to their leaving the possession of Dickens was not adverse to appellant. Up to 1931 there is evidence that the north half of the property was either rented or farmed by Dickens for the use and benefit of appellant. After 1931, or a short time thereafter, at least, Dickens farmed the premises in controversy as a unit. He made no accounting to appellant for any of the crops. He refused to make her a deed about 1931. Appellant further testified that several times up until 1931 and before that time that she had asked Dickens for a deed to her half of the property and that he would tell her when she asked him for a deed that when she had it paid out that he would give her a deed; that she relied on these statements; that she believed that he would do what he said he would do; that during the period of time from 1923 to the present date, aside from money received from her labor in sewing that she did not have any source of income; that with regard to the payment of taxes and the note payments on the property she had depended upon Dickens to handle those.

On the 7th of December, 1934, Dickens and his wife made an oil and gas lease to the premises to Thornton Lomax, Jr. It was for a term of ten years, provided for the customary royalty of $\frac{1}{8}$; further that if drilling operations were not commenced in one year the lease would terminate unless on or before the anniversary date Lomax should pay or tender to lessor the sum of $80, which would cover the privilege of deferring commencement of drilling operations for a period of 12 months. In like manner it provided for deferment of drilling operations during the primary term. This oil lease was duly recorded and appellant had notice thereof and never received or claimed any portion of the delay rentals paid thereunder. On April 11, 1944, Dickens and his wife executed and delivered an oil and gas lease to the Tidewaters Associated Oil Company. The base term was for a term of five years and as long thereafter as oil or gas or other minerals was produced from said land. It reserved a royalty of $\frac{1}{8}$; provided it should terminate unless drilling should commence within one year or the lessee should pay or tender to lessor the sum of $160 as delay rental, which would defer the commencement of the drilling of a well for a period of twelve months; that like annual payments would defer the necessity of drilling a well. This lease was filed for record on June 3, 1944, and recorded in Vol. 40, p. 24 of the Oil and Gas Records of Gaines County, Texas. All the land notes were paid off by Dickens prior to 1934. He likewise paid the interest accruing on the debt to the State and the interest accruing on the notes.

After 1928 appellant has neither received nor demanded any of the revenues arising from the place. No part of the revenues she received for the year 1928 was

devoted to payment for the farm. There is evidence that she demanded a deed in 1931, but from that time, prior to the filing of this suit in 1950, she has apparently asserted no claim to this land or to the revenues arising therefrom.

■ There can be but little question that the evidence is sufficient to raise the issue of a trust in favor of appellant. Beyond any question the evidence is sufficient to raise the issue of a fiduciary relationship between Dickens and appellant. They sustained the relationship of mother and son. The question has not been raised that on account of his minority Dickens was unable to sustain a fiduciary relationship to his mother. If Dickens, regardless of his minority, took the funds of his mother with or without her consent and made a payment on land, taking the title in his name, a trust would arise. If he agreed that the rents and revenues realized from the property should be devoted to the discharge of the deferred obligation for the purchase price of the property, we think the three letters, the substance of which we have heretofore set forth, constitute a ratification of that contract, that is, ratification not as a matter of law, but raised the issue. These letters were all written after he had attained the age of twenty-one years.

■ Beyond any question, at the time appellant claims to have advanced the $320 for the first payment, she knew that it was contemplated that title be taken in the name of Dickens. If it was likewise agreed that she should have a half interest in the property, then it is tantamount to an agreement that Dickens would hold one-half of the property in trust for her. Her further testimony as to this contract was that the deferred payments were to come from the revenues of the property. If duties with reference to this property Dickens owed to appellant, it was by virtue of this express contract. It is perhaps not important as to whether we are dealing with an express or implied trust, the transaction having arisen prior to the enactment of the Texas Trust Act, Vernon's Ann.Civ.St. art. 7425b–1, it may be proven by parol testimony, Binford v. Snyder, 144 Tex. 134, 189 S.W.2d 471.

This testimony tends to raise the issue as to an express trust rather than a resulting trust. Barnett v. Vincent, 69 Tex. 685, 7 S.W. 525; McAlister v. Eclipse Oil Co., 128 Tex. 449, 98 S.W.2d 171; Bennett v. McKrell, Tex.Civ.App., 125 S.W.2d 701, 702, modified and affirmed, 135 Tex. 557, 144 S.W.2d 242; Cluck v. Sheets, 141 Tex. 219, 171 S.W.2d 860 (opinion adopted).

■■ A trust other than a purely voluntary settlement ordinarily arises from the payment by the beneficiary of the purchase price of the property or the unconditional obligation to pay same to the trustee or on behalf of the trustee. It arises, if at all, the very moment the legal title vests. Appellant was under no obligation to grantors to pay any part of the deferred consideration. She was under no obligation to her son other than her agreement that the revenues of the property might be used for the purpose of meeting these deferred obligations, unless the agreement to buy jointly impliedly obligated her to reimburse her son for any portion of the purchase price which he paid for her. The year 1928 she farmed the north half of the property. The revenues derived by her were not devoted to the payment of these deferred obligations or taxes. She seems to have devoted same to her own use. It may be that in order for a trust to have arisen her obligation to meet her part of these deferred payments must have been complete and unconditional, that is, she must have been unconditionally bound to the repayment to her son for the payment of her just proportion thereof. Wright v. Wright, 134 Tex. 82, 132 S.W.2d 847 (Com.App. op. adopted). If we take Dickens' version of the transaction relating to the land in controversy, about 1927, long after his contract with his grantees to acquire the property, he agreed in the event his mother would pay for half of the property she would have half of same, or the north half of same. If the testimony of Dickens be true there is no trust involved, it was a contract of sale. See Morrison v. Farmer, 147 Tex. 122, 213 S.W.2d 813.

About this time the property was farmed separately, the north half by appellant and

the south half by Dickens. Even after appellant left the property and Dickens farmed it up to 1931 he kept separate account of crops from the north half and the south half. He further ceased to keep separate accounts as to what was produced on the north half and on the south half. From that date he farmed the half section as a unit, and took all the proceeds therefrom, paid all taxes thereon as they matured, rendered same for taxation and claimed title to the property. The real issue posed by this appeal, in our opinion, is whether or not as a matter of law the evidence established appellant's claim was barred by limitation, or she was debarred from asserting same by laches, that is to say, a stale demand. In our opinion the letters of September 23, 1929, December 17, 1929 and February 7, 1931, the substance of which has been heretofore recited, were sufficient at least to raise the issue that up to that time the possession of Dickens was not adverse to appellant. If we accept appellant's testimony as true she had a joint right of possession with Dickens. The evidence is insufficient to show as a matter of law that prior to 1931 he denied or questioned appellant's right of possession to the land.

■ In view of the relationship existing between Dickens and his mother, accepting her version of the transaction as true, it required notice either actual or constructive to start the Statute of Limitation running against his mother's claimed interest in this land. 2 Tex.Jur. p. 142, pp. 145, 147.

■ From 1931 to 1950, the date of filing this suit, appellant never received any revenue from this land, never paid any taxes thereon, never made any demand for revenue, never demanded a deed to an interest in the place. According to her testimony her financial condition during this period was not of the best. She knew her son leased this property in 1934 for oil. This lease was recorded. Likewise in 1944 he executed an oil and gas lease on the premises and same was recorded. Appellant never at any time made any claim to the delay rentals received by her son. Her son added improvements on the South half of the property. The release from her son's grantors of the vendor's lien was made in 1933. This release was placed on record. Nevertheless, a majority of the court is of the opinion that the evidence was sufficient to raise an issue as to whether defendant's possession was adverse as "Adverse Possession" is defined by Art. 5515, V.A.C.S. There can be no question but that defendants recognized that plaintiff had some interest in the north half of the 320 acres in 1928, and from then through 1931. Whether defendants held possession during this period as trustee, co-tenant or tenant of plaintiff the inference that he held in subordination to some interest in plaintiff is inescapable; otherwise why keep separate books on the north one-half of the tract which she had farmed in 1928? The letters in evidence clearly show recognition of her interest. That defendant's possession was so held until filing of the suit is inferable from the close relationship of mother and son and from the fact that defendants never unequivocally denied that they so held. There are many circumstances tending to show a repudiation, i. e., improvements, payment of taxes, the failure to keep separate accounts after 1931, and to account to plaintiff, and perhaps the strongest, the execution of the oil and gas leases in 1934 and 1944. These circumstances are not conclusive. This is clearly indicated in Moore v. Knight, 127 Tex. 610, 94 S.W.2d 1137, loc. cit. 1140, where the court said: "It is not necessary in the present case to hold that the conveyances to Moore were within themselves sufficient to constitute notice of the repudiation of the tenancy relationship, but the taking and recording of these deeds, in connection with all other circumstances in the case, was sufficient to sustain the finding of the jury that there was notice to plaintiffs of the adverse claim of defendant."

■ If it can be inferred, and we think it can, that defendants held as tenants of plaintiff from 1928 to 1931, then it was a question of fact under all the circumstances whether they repudiated such tenancy by acts so open and notorious as to put the Statute of Limitations into operation with-

in the rule of Benskin v. Barksdale, Tex. Com.App., 246 S.W. 360, and Houk v. Kirby Petroleum Co., Tex.Com.App., 65 S.W.2d 496. It is strongly intimated by Associate Justice Brown in Emporia Lumber Co. v. Tucker, 103 Tex. 547, 131 S.W. 408, 409, that an attempted sale by a tenant by deed duly recorded would not have been a sufficient notice of repudiation to set the Statute in operation. Judge Brown says: "The undisputed evidence shows that the deed from Cobb and wife to Oates was not recorded five years before the institution of this suit, therefore limitation of five years did not accrue if notice was thereby given of the adverse claim. *But we do not mean to say that, if this had been done, it would have been sufficient notice to the owners of the land of a repudiation of the tenancy by Oates.*" (Emphasis ours.) Here the leases which defendant executed in no way deprived them of the possession of the surface of the land for farming purposes, which they held or could have held as tenants of plaintiff, and the mere fact that they were wrongful attempts to alienate plaintiff's property would not, we think, operate as repudiation and notice thereof of the tenancy as a matter of law. It is still a question of fact.

This opinion down to the word "nevertheless" in the second paragraph on page 10 hereof [241 S.W.2d 664] is copied, with minor corrections, from a draft prepared by Chief Justice Price.

In the opinion of a majority of the court the trial court erred in directing a verdict against appellant. The judgment is therefore reversed and the cause remanded.

PRICE, C. J., dissents.

On Motion for Rehearing.

PRICE, Chief Justice.

I dissented from the original disposition of this case. On motion for rehearing I desire to briefly state my views as to the matter. In my opinion the evidence is insufficient to raise the issue of an express, resulting or constructive trust. A trust arises at the very moment the legal title vests in the one sought to be held as trustee. Under appellant's testimony, if trust there was it was an express trust. Appellee acquired this property in pursuance of a contract. For the cash payment he gave his note to the grantor. If his mother advanced the rather small cash payment the reasonable inference from her testimony is that she voluntarily advanced same and that appellee did not embezzle or convert her money, if her money did make the first payment. This cash payment was only a small part of the consideration; the balance of the consideration was appellee's promissory notes. Appellant was bound neither to appellee's grantor nor to appellee to pay same or any part thereof. The contract, as reflected by the testimony of appellant, amounted to nothing more than a contract that appellee would acquire the land and thereafter convey it to appellant.

The evidence is undisputed that appellee in his own name and for his own benefit about 1934 leased this property to a third party. This lease was immediately placed upon record. It is true it only included the oil and gas rights. Appellant admitted that she had notice of the making of this lease about the time same was made. It amounted to a sale of the entire mineral estate in the land. If appellant had any right it purports to convey such right to the lessee. She knew of the lease and she knew that appellee was not accounting to her for any of the delay rentals. This conveyance, in my opinion amounted to a repudiation and denial of any rights of appellant in the land, and his adverse claim thereto. In my opinion, beyond any question the legal effect of the conveyance, taken in connection with appellant's actual notice thereof, coupled with appellee's possession of the land as a matter of law set in motion the statute of limitations and if appellant ever had any claim to an interest in this land, barred the assertion thereof.