Rose Burton ATKINS et al., Appellants,

v.

Mary T. CARSON, Appellee.

No. 14851.

Court of Civil Appeals of Texas, San Antonio.

April 30, 1971.

Rehearing Denied May 26, 1971.

**496**

Atkins, deceased, and the independent executors of the estate of George E. Atkins, Arthur Clinton Atkins, George E. Atkins, Jr., and Dorothy Sue Merriweather Atkins, who also appear in their individual capacities, appeal from a summary judgment rendered in favor of defendant, Mary T. Carson, in a suit in which plaintiffs sought to establish an interest in land situated in Pecos County and to compel an accounting of the affairs of an alleged partnership between George E. Atkins, deceased, and Page E. Carson, deceased husband of defendant.

The suit was originally filed on February 9, 1960, naming Page E. Carson and Mary T. Carson as defendants. On October 27, 1960, the Carsons filed a motion for summary judgment which was denied on December 17, 1960. Page Carson subsequently died and on December 5, 1968, the trial court entered an order eliminating Page Carson as a party to the suit. On January 9, 1969, defendant, Mary Carson, filed a "Motion for Summary Judgment on Title to Real Estate," and it is from the action of the trial court granting this motion and rendering judgment that plaintiffs take nothing that this appeal is taken.

### Plaintiffs' Pleadings

While the first count of plaintiffs' pleadings are cast in the form of an action in trespass to try title, their claim of ownership of a tract of land consisting of 1239.6 acres known as the Eaker Place rests on the theory of a resulting purchase money trust and on the existence of a partnership between plaintiffs' decedent and Page Carson. According to plaintiffs' third amended original petition:

1. About November 1, 1948, Atkins and Carson orally agreed that they would purchase the Eaker place together for a total consideration of $33,080.00, which included the assumption of a lien in the approximate amount of $12,000.00. Carson was to apply for a loan in the amount of $24,000.-

Sedberry & Williams, Wilson, Logan, Lear & Massey, San Angelo, for appellants.

Shelby H. Blaydes, Fort Stockton, C. H. Gilmer, Rock Springs, for appellee.

CADENA, Justice.

Plaintiffs, Rose Burton Atkins, individually and as surviving wife of George E.

00, payment of which would be guaranteed by Atkins. Title to the land was to be taken in the name of Carson in order to facilitate his obtaining the loan. Atkins deposited to the account of Carson the sum of $21,080.00, which Carson used in purchasing the land from the Eakers. Atkins arranged a meeting between Carson and Doak, a loan agent with whom Atkins had done business in the past, and Carson made application for the loan. The agreement was to the effect that if the loan was obtained, $12,000.00 was to be used for the purpose of discharging the lien on the Eaker land, and $12,000.00 was to be paid to Atkins.

2. Carson was to sell certain land owned by him for approximately $10,000.-00. This money was to be invested by Carson in the venture, matching the approximately $10,000.00 which Atkins would still have invested in the venture after he had been paid the $12,000.00 from the proceeds of the loan.[1] The $10,000.00 which Carson was to invest in the venture was to be used in the farming and livestock operation which Atkins and Carson would undertake together. If Carson was unable to sell his land, but the $24,000.00 loan was obtained, then Carson could qualify for his one-half interest in the land and the partnership assets by giving all of the profits from the operation to Atkins until Atkins received an amount sufficient to equalize the investments of Atkins and Carson. Carson was to live on the land and operate the farming and livestock business as a partnership.

3. In the alternative, plaintiffs alleged a partnership agreement between Atkins and Carson whereby Atkins made an initial investment of $23,080.00 and a subsequent investment of $12,644.51, while Carson, who invested nothing, managed the farming and livestock operation. The Eaker Place was acquired as partnership property. Under this theory, plaintiffs claimed an interest in the partnership and asked for an accounting.

4. Finally, plaintiffs sought a dissolution of the partnership, appointment of a receiver, and a distribution of the partnership assets.

### Defendant's Pleadings

In addition to a plea of not guilty and a general denial, defendant interposed specific denials of the material allegations contained in plaintiffs' pleadings. According to defendant's pleadings:

1. Carson was not acting on behalf of Atkins in purchasing the Eaker land. While Carson obtained from Atkins the money required to purchase the equity of the Eakers in the land, the money thus advanced by Atkins was a loan which Carson fully repaid. No partnership ever existed between Atkins and Carson.

2. On or about November 5, 1948, the Eakers agreed in writing to sell the land in question to Carson for a cash consideration of $21,080.00 and the assumption by Carson of the outstanding mortgage indebtedness, approximately $12,000.00 on the land. Under the contract, Carson was to obtain a loan on or before January 1, 1949, for the purpose of paying the cash consideration. On the same date, November 5, 1948, the Eakers executed a deed conveying the land to Carson and also executed a bill of sale transferring certain personal property to Carson. The contract of sale, deed and bill of sale were placed in escrow with a bank with directions to deliver the instruments to Carson, upon deposit by Carson, within the period expiring January 1, 1949, of $21,080.00 to the account of the Eakers.

3. Shortly thereafter, the Carsons moved upon the land with the consent of the Eakers. Although Carson attempted to secure a loan, he was unable to do so prior to January 1, 1949, and on February 11, by

---

1. In addition to the $21,080.00 which Atkins made available for the purchase of the land, he invested an additional

$2,000.00 to be used for miscellaneous improvements and to equip the land for farming.

written agreement between Carson and the Eakers, the time for performance by Carson was extended until April 11, 1949. In February, Carson obtained a loan of $8,000.00 from Atkins, and on or about March 17, 1949, Carson obtained an additional loan of $15,080.00 from Atkins. This money was paid to the Eakers by Carson and on March 18, 1949, the escrow agent delivered the deed, executed by the Eakers on November 5, 1949, conveying the land in question to Carson.

4. Carson subsequently repaid all the money which he had borrowed from Atkins.

5. Plaintiffs' claims were barred by the ten-year, the five-year, the four-year and the two-year statutes of limitations (Articles 5510, 5509, 5527 and 5526, Vernon's Annotated Civil Statutes). Defendant also contended that plaintiffs were guilty of laches.

*The Summary Judgment Record*

Defendant's sworn motion for summary judgment prayed that summary judgment be rendered awarding her title and possession of the land in question. The motion alleged that defendant owned the fee simple title to the land, that no genuine issue of material fact concerning her title to the land existed, and that plaintiffs had alleged no facts which, if proved, would establish any interest in the land in favor of plaintiffs. In support of this motion, defendant adopted the motion for summary judgment previously filed by defendant and her deceased husband, Page Carson, on October 27, 1960, and the affidavits and exhibits attached thereto.

Plaintiffs' reply to the defendant's motion for summary judgment was supported by:

1. The affidavit of one of the Eakers, who conveyed the land to Carson, to the effect Atkins was present from the very beginning of the negotiations between Carson and the Eakers.

2. The affidavit of Clinton Holt to the effect that Carson had admitted that Atkins was the owner of at least a one-half interest in the land.

3. Certified copies of partnership tax returns filed and signed by Page Carson on behalf of the partnership of Atkins & Carson, disclosing that Atkins owned a one-half interest in the partnership. In such tax returns Carson claimed as deductions, on behalf of the partnership, depreciation on improvements located on the land in question.

4. Affidavit of C. L. Eaker stating that possession of the land in question was not delivered to Carson until after February 11, 1949.

5. Excerpts from the deposition of J. W. Doak, which deposition was on file among the papers of the case. According to the Doak deposition:

a. In November, 1948, and for two or three months thereafter, he met on several occasions with Atkins and Carson at one of these meetings, it was said that Atkins and Carson were thinking of "buying a place and form a partnership." There was talk about securing a loan. Doak pointed out that he was working on a loan for Atkins individually, and that he thought it unwise to begin negotiations on an additional loan for a partnership of which Atkins was a member.

b. No loan application was made at that time. Subsequently, at another meeting which Doak described as taking place in November, 1948, "they" decided to make an application for a loan. Doak repeated that he did not want to take another loan application on a partnership. Atkins then said, "Well, you take an application for Page [Carson] and I will be a silent partner." Doak mentioned that there was "no land to put in the application" for the loan, and that it was necessary that the application show "a contract or a Deed or something to show—the cost of the land." Atkins said he would "put some money in the

partnership and we will go ahead and purchase the place. You take this application for Mr. Carson." Atkins stated he would guarantee payment of the loan. Carson stated he would sell some property and place the proceeds into the partnership "to equalize the partnership," and that when the loan, in the amount of $24,000.00 was secured, he would repay Atkins and "Mr. Atkins would equalize his share of the partnership then it would be a 50–50 partnership between Mr. Carson and Mr. Atkins." Carson was to live on the land, rent free, and operate it, with the profits being divided equally between Atkins and Carson.

c. At the same meeting it was agreed that if Carson could not sell his property, all profits from the operation would be paid to Atkins "until the partnership was equalized."

d. The application for a $24,000.00 loan was rejected, and Doak informed Atkins and Carson that he thought a loan in the amount of $17,500.00 would be approved. An application, in Carson's name, for a loan in the amount of $17,500.00 was prepared. It was agreed that Atkins was to invest "Twenty-three thousand and a little better" in the venture. It was also agreed that Atkins was to own a one-half interest in the land.

3. Doak met with Atkins and Carson on or about March 19, 1949, at which time the details of the arrangement between Atkins and Carson were discussed again, substantially as outlined in the preceding four paragraphs. At the request of Atkins and Carson, Doak prepared a memorandum which was signed by both Atkins and Carson. This instrument was as follows:

"This agreement entered into between Geo Atkins and Page E. Carson. Page E. Carson has acquired 1239.6 acres of land with all improvements. Known as the Claud Acker place, in Pecos County, Texas. Geo Atkins furnished Page E. Carson $23,080.00 to complete purchase of said land, and said place to be operated in the name of Page E. Carson. Each shareing in one-half of all profits in said place.

"Page E. Carson agrees to repay to Geo Atkins $23,080.00 when such finances are available."

Atkins and Carson, when they requested Doak to prepare the memorandum, told him to prepare a memorandum showing that Atkins "was putting $23,080.00 of his own money in in connection with the purchase of the Claud Eaker place." The memorandum was not intended to embody the entire agreement.

*Opinion*

In his answer to written interrogatories, Page E. Carson stated that the written memorandum of March 19, 1949, did not embody the complete agreement between him and Atkins, since it did not contain reference to the fact that Carson was to receive $100.00 monthly as compensation for his services in operating the farming and livestock enterprise.

The preceding recapitulation of the summary judgment record omits mention of facts which would support defendant's defensive allegations, since the question before us is not whether there is evidence to support defendant's allegations, but, rather, whether defendant has discharged her burden of establishing the absence of any material issue of fact.

■ It is to be noted that defendant's motion for summary judgment related only to the issue of title to the land in question. The prayer was limited to judgment for title and possession of the land, with no mention of the issues raised by plaintiffs' pleadings concerning the existence of the Atkins-Carson partnership and their prayer for accounting, dissolution of the partnership, appointment of a receiver, and distribution of the partnership assets. But we need not decide whether the motion for summary judgment was sufficient to sup-

port a judgment in favor of defendant on the entire case, since the income tax returns filed by Carson as late as 1959 are sufficient to raise a fact issue as to the existence of the partnership and are inconsistent with defendant's contention that all loans made by Atkins to Carson had been repaid prior to 1955. The summary judgment record is insufficient to establish, as a matter of law, the non-existence of the Atkins-Carson partnership.

We also conclude that the trial court erred in granting summary judgment vesting in defendant title to the land in question.

It is undisputed that the money used by Carson in purchasing the land was furnished by Atkins. The deposition of Doak is sufficient to raise a fact issue with reference to the question of whether or not such money was made available by Atkins to Doak as a loan, or whether it was advanced by Atkins with the understanding between Atkins and Carson that, while title to the land was to be taken in the name of Carson, Atkins was to have an interest in the land. The memorandum agreement of March 19, 1949, which is clearly sufficient to support a finding that the advance by Atkins constituted, as defendant contends, a loan, which would preclude the existence of a resulting trust, was described by Doak as not being intended to embody the entire agreement between Atkins and Carson, and was admitted by Carson to be incomplete. It cannot, therefore, be given conclusive effect.

When A pays the consideration for the purchase of property and causes the ownership of the property to be acquired in the name of B, the traditional rule is that B holds the property subject to a resulting trust in favor of A. Jackson v. Hernandez, 274 S.W.2d 131 [Tex.Civ.App.—Galveston 1954, aff'd, 155 Tex. 249, 285 S.W.2d 184 (1956)]; 4 Powell, The Law of Real Property, Section 592, p. 564.98 (1967).

■ Defendant's insistence that a finding of a purchase money resulting trust in this case would violate the statute of frauds is without merit. While it is often pointed out, as in Alworth v. Ellison, 27 S.W.2d 639, 640 (Tex.Civ.App.—Eastland 1930, writ ref'd), that the statute of frauds "applies to an equitable title the same as to the legal title," it is universally held that the statute of frauds is no barrier to parol proof of a purchase money resulting trust. Jackson v. Hernandez, supra; Baylor University: Comments, Resulting & Constructive Trusts in Realty, 1 Baylor L.Rev. 296 (1949). Nor does the Texas Trust Act support defendant's position, since Article 7425b–2 excludes resulting trusts from the definition of "trusts."

Next appellant contends that, even if plaintiffs' interpretation of the facts be accepted as true, no resulting trust can exist in this case in view of the rule to the effect that a purchase money resulting trust must arise, if at all, at the time of the passage of title. Cohrs v. Scott, 161 Tex. 111, 338 S.W.2d 127 (1960). Defendant argues that Page E. Carson obtained equitable title to the land on November 5, 1948, when the Eakers agreed to convey the land to Carson and placed in escrow a properly executed warranty deed conveying the land to Carson. This was prior to the time the purchase price was paid.

■ Perhaps the majority of American jurisdictions hold that a purchaser acquires an equitable title to land immediately on entering into a valid executory contract of sale. Southern Methodist University: Batson, Passage of Equitable Title in Texas Under an Executory Contract for Sale of Land, 5 Sw.L.J. 107 (1951). But at an early date our Supreme Court made a distinction between an equitable title and an equitable right with regard to land contracts, holding that so long as the purchase price remained unpaid the purchaser has only an equitable right. Browning v. Estes, 3 Tex. 462 (1848). The purchaser obtains equitable title only when he has fully performed under the contract. Hemming v. Zimmerschitte, 4 Tex. 159 (1849).

Subsequent cases did not always follow this distinction. Defendant calls our attention to Alworth v. Ellison, supra, where it was held that a purchaser under a contract for the sale of land who had the right to have the land conveyed to him upon performance of specified conditions had equitable title to the land. However, the same justice who wrote the Alworth opinion as a member of the Eastland Court later, as a member of the Supreme Court, was the author of an opinion holding that so long as the purchaser under a contract of sale has not paid the purchase price, he has only an equitable right, which will ripen into equitable title upon payment of the purchase price. Johnson v. Wood, 138 Tex. 106, 157 S.W.2d 146 (1941).

■ Apparently, in most cases, the distinction between equitable right and equitable title would not affect the result. But the distinction is decisive in one situation. Only after the purchase price has been paid and the purchaser has acquired equitable title may he bring an action of trespass to try title against his vendor. Johnson v. Wood, supra.

■ In any event, whether Carson had acquired equitable title to the land before Atkins furnished the money for the purchase of the land is irrelevant. The rule to the effect that a purchase money resulting trust must arise at the time of the passage of title to the resulting trustee has reference to the passage of the legal title, as distinguished from the equitable title. The trust is engrafted upon the legal title. Therefore, the correct statement of the rule is that the purchase money resulting trust must arise, if it is to arise at all, at the very time the legal title passes. McAlister v. Eclipse Oil Co., 128 Tex. 449, 98 S.W.2d 171 (1937). "It is familiar law that a trust must result, if at all, at the very time a deed is taken and the legal ti-

tle vested in the grantee." Wright v. Wright, 134 Tex. 82, 132 S.W.2d 847, 849 (1939). Carson did not acquire the legal title until he had obtained the money from Atkins for the purpose of paying the consideration for the conveyance.

Defendant cannot rely on either the ten-year statute of limitations or the five-year statute. There is no evidence in the record which conclusively establishes that Page E. Carson claimed the full title to the land under circumstances which would satisfy the requirements of the land limitation statutes. Nor does the record establish as a matter of law that plaintiffs' action for accounting and distribution of the partnership assets is barred by either the four-year or the two-year statute of limitations. The partnership income tax return filed by Carson in 1959 raises, at the least, a fact question as to whether Carson had repudiated the partnership more than two years before the filing of this suit by plaintiffs in 1960.

■■ Nor is it conclusively established that the rights of plaintiffs are barred by application of the doctrine of laches. There is nothing in the record which precludes the existence of an issue of fact with reference to whether or not Carson recognized the rights of plaintiffs, or of their decedent, until a short time before suit was filed. 57 Tex.Jur.2d, Trusts, Section 230, p. 608. The beneficiary of a resulting trust is not barred from enforcing the trust merely by lapse of time. It is only where the trustee under a resulting trust repudiates the trust to the knowledge of the beneficiary that the beneficiary may be barred by laches from enforcing the trust. 2 Restatement, Trusts 2d, Section 409, p. 330 (1959).

The judgment of the trial court is reversed and the cause is remanded for trial on the merits.