**Charles R. MILTON, II, Appellant,**

v.

**ARANSAS SHRIMP COOPERATIVE, et al., Appellee.**

**No. 13-82-374-CV.**

Court of Appeals of Texas, Corpus Christi.

Dec. 22, 1983.

Robert W. Johnson, Corpus Christi, for appellant.

Ron S. Galloway, Groom, Miglicco & Gibson, Houston, for appellee.

Before BISSETT, UTTER and GONZALEZ, JJ.

## OPINION

## ON MOTION FOR REHEARING

UTTER, Justice.

The opinion on rehearing of this Court rendered on November 10, 1983, is hereby withdrawn and the following opinion is substituted therefor.

The appeal is brought by Charles R. Milton, II, defendant and counter-plaintiff below, from the rendering of a take nothing judgment on his counter-claim. The subject matter of this appeal, appellant's counter-claim, had been severed from the original cause in which appellant was defendant. The counter-claim represented appellant's allegations that the Board of Directors of the Aransas Shrimp Cooperative ("the Co-op"), appellee herein, acted improperly in terminating appellant's membership in the Co-op, thereby denying him a proportionate share of the net proceeds from the sale of the Co-op's assets.

Through stipulation and uncontroverted evidence the following facts were established: Appellant had been the operator of a commercial shrimping vessel in Aransas Pass. As such, he had been a member of and the owner of one share of stock in the Co-op. He bought his first vessel, "Miss Bitty", in the early 1970's, and from that time until the time he sold "Miss Bitty" in December 1979, all of the shrimp he produced went to the Co-op. He sold "Miss Bitty" so that he could invest the proceeds in "Miss Cindy", a new boat which he had ordered, construction of which had begun in May 1979. On March 13, 1980, he tendered his stock certificate issued in the name of "Miss Bitty" to the Co-op, and he was issued a new share in the name of "Miss Cindy". At the time that his new share was issued, the construction of "Miss Cindy" had not yet been completed, a fact well known to the Co-op membership; yet, the Co-op's Board of Directors voted unanimously to issue the new share. One month later, on April 13, 1980, "Miss Cindy", just before its completion and while being moved from one part of the harbor to another for further completion, was struck by a gust of wind, capsized and sank.

This unfortunate incident occurred in an area of salt water with a soft mud bottom into which the boat settled, filling the engine room with mud and the machinery and diesel engines with salt water. The photograph introduced into evidence, reproduced below, depicts the boat resting on its port side with the water level over the centerline and nearly up to the starboard propeller. The vessel has a twenty-four foot beam (i.e., the vessel is twenty-four feet wide at its widest point); nearly two-thirds of the vessel was completely submerged.

"Miss Cindy" remained semi-submerged for ten days to two weeks; it took that long to procure a barge and crane capable of lifting it out of the water. All arrangements for salvage and repair were made by appellant's insurance carrier.

Appellant testified as to the effect of a vessel sitting in such a position in mud and salt water for that period of time. The theme that is recurrent throughout his testimony is that "[i]t just ruined everything." The boat has not been operable since the time of accident. Attempts have been made to sell it for scrap, with no luck. According to appellant, "[n]obody wants a boat that's been turned over before."

At a meeting on March 26, 1981, the Board of Directors of the Co-op agreed to sell the Co-op's assets for the sum $3,022,-626.53 and, after all debts were paid, to distribute to each shareholder, excluding appellant, the net proceeds from the sale according to a shareholder Settlement Agreement and Release, to which appellant was not a party. At the same meeting the Board also voted unanimously to terminate appellant's membership, thereby denying him a proportionate share on the proceeds from the sale of the Co-op. At the time that the Board of Directors of the Co-op voted to terminate his membership, appellant had been a longstanding shareholder in the Co-op. Litigation ensued which resulted in a take nothing judgment on appellant's severed counter-claim.

Appellant's first point of error alleges that the trial court erred in not determining that appellant was a member in good standing of the Aransas Shrimp Cooperative on the date of its dissolution thereby entitling him to share in its net proceeds.

The Co-op was duly organized and had existed under the Texas Cooperative Act, TEX.REV.CIV.STAT.ANN. art. 5737, et seq. (Vernon 1958).[1] The agreements of the individual members constitute a single

1. Articles 5737 to 5764 were repealed in 1981. The same Act repealing articles 5737 to 5764 enacted the Texas Agriculture Code. The provisions of Articles 5737 to 5764 are now found in TEX.AGRIC.CODE ANN. §§ 51.004 and 52.001, et seq. (Vernon 1982).

contract between the members of the cooperative association, as well as a contract between the members and the cooperative association. *Lennox v. Texas Cotton Cooperative Association,* 55 S.W.2d 543 (Tex. Comm'n App.1932, holding approved); TEX.REV.CIV.STAT.ANN. art. 5737, et seq. (Vernon 1958). Art. 5763 [2] of the Texas Cooperative Act, in part, provides:

> The provisions of the general corporation laws of the State and all powers and rights thereunder apply to (cooperative) associations organized hereunder except when in conflict with the provisions of this chapter...

By necessary reference to this State's general corporations laws, the rights and privileges running with a share of stock in a cooperative association are those which its charter or some amendment thereof grants to it. See *West Texas Utilities Co. v. Ellis,* 133 Tex. 104, 126 S.W.2d 13 (Tex.Comm'n App.1939, opinion adopted). The record before us contains the Co-op's By-laws. Article V, Section 1 thereof provides that "... all such members [of the Co-op] shall be bound and governed by these By-laws." Article V continues, in pertinent part, as follows:

> *"Section 9. RIGHT TO TERMINATE MEMBERSHIP.*
>
> If the Board of Directors shall find, following a hearing, that a Voting Member or an Associate Member has ceased to be a producer of seafood products or not complied with the provisions of Section 8 above or, with the exception set out in Section 1 above, does not continue to meet the requirements set up in Section 2 above, the Board of Directors may terminate such party's membership, and in the case of a Voting Member, shall repurchase the common stock of such member at par value and upon notice such member must deliver to the Cooperative such person's stock certificate within thirty (30) days of such termination.
>
> However, such termination shall not affect the ownership by such person of

preferred stock of the Cooperative or patronage dividends earned up to the date of such termination.

> *Section 10. INACTIVE MEMBERS.*
>
> At such time as the vessel allocated to a voting member, as provided in Section 5 hereof, is disposed of by such Member or the corporation holding title to such vessel, or such vessel is lost or destroyed, except as a result of an act of God, which is defined as follows:
>
> (a) Sinking of such vessel;
>
> (b) Destruction by hurricane;
>
> (c) Destruction by fire;
>
> (d) Destruction by any other natural disaster,
>
> such Member, if he shall for a period of one (1) year following the disposition, loss or destruction of said vessel, fail to produce seafood at the Cooperative's facility in Aransas Pass, shall be required to surrender his share of common stock of the Cooperative for which he will be paid at par value, and shall have no further rights in connection with the ownership or management of the Cooperative....
>
> *Section 11. DESTRUCTION BY ACT OF GOD.*
>
> As to any vessel lost or destroyed by act of God, as defined in Section 10 hereof, the Member to which such a vessel is allocated shall not be required to surrender his common stock or Associate Membership Certificate for a period of two (2) years, and will have the right to replace such a vessel during such two-year period.... If such vessel is not replaced within such two year period, the Member to which such vessel is allocated must surrender his common stock or Associate Membership Certificate in the Cooperative, and as to all Voting Members, his rights thereafter shall be determined in accordance with the provisions of Section 10 hereof."

To the extent that he was bound and governed by the terms of the By-laws, appellant was entitled to the privileges enu-

---

**2.** Article 5763 was repealed in 1981. The provisions of article 5763 have been re-enacted in

TEX.AGRIC.CODE ANN. §§ 52.004, 52.013 and 52.122 (Vernon 1982).

merated therein, including the grace periods set forth in Sections 10 and 11 in the event of the loss or destruction of his vessel. At the meeting of the Board of Directors of March 26, 1981, the Board voted that appellant's membership should be terminated because it found that no seafood had been produced by appellant from the "Miss Cindy" since the issuance of the stock share for that vessel on March 12, 1980. It is apparent that the board's decision to terminate appellant's membership was executed pursuant to Article V, Section 9 of the By-laws, supra. As we read Article V, Sections 9, 10, and 11 together, we are of the opinion that, if the appropriate circumstances existed, then appellant was entitled to the protection from termination under Section 9 afforded by the grace period provisions in sections 10 or 11 as a matter of right. The essential issue here is: Are the grace period provisions of Sections 10 or 11 applicable to the instant case? We hold that they are.

Under Section 10, appellant was to be given one (1) year from the date his vessel was "lost or destroyed" before he would be required to surrender his share of stock, unless such loss or destruction occurred "as a result of an act of God...." Section 10 defines "an act of God" to include the "sinking" of a member's vessel or the destruction of a member's vessel by hurricane, fire or "other natural disaster." Under Section 11, appellant was to be given a two (2) year grace period in the event of loss or destruction by "act of God."

■ When construing the terms of an instrument we will presume that they are to be given their plain, ordinary and generally accepted meanings unless the instrument itself shows them to have been used in a technical or different sense. *Western Reserve Life Insurance Co. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554 (1953, cert. denied 347 U.S. 928, 74 S.Ct. 531, 98 L.Ed. 1081 (1954)). Other than the definition of the phrase "an act of God" which the instrument itself provides, we discern no terms therein which are not subject to plain and ordinary interpretation. Certainly

there is nothing to indicate that such interpretation would in any way defeat the intention of the parties. See *Fox v. Thoreson*, 398 S.W.2d 88 (Tex.1966); *Integrated Interiors, Inc. v. Snyder*, 565 S.W.2d 350 (Tex.Civ.App.—Fort Worth 1978, writ ref'd n.r.e.).

Analyzing the plain meaning of the terms pertaining to "an act of God", it becomes apparent the "Miss Cindy" was "destroyed." "Destroy" is defined thusly:

"[D]estroy ... to ruin; to bring to naught; to spoil completely; ... to take away the utility of; to make useless."

Webster's New Twentieth Century Dictionary, Second Edition, p. 495, (William Collins 1979).

All of the evidence adduced at the trial indicates that "Miss Cindy" was "destroyed" as a result of the accident and that such was still her state at the time that the Board of Directors of the Co-op voted to terminate appellant's membership.

Similarly, analyzing the plain meaning of the terms pertaining to "an act of God", it becomes apparent that "Miss Cindy" did "sink". "Sink" is defined thusly:

"[S]ink ... to go beneath the surface of water, deep snow, soft ground, etc., so as to be partly or completely covered."

Webster's New Twentieth Century Dictionary, Second Edition, p. 1695, (William Collins 1979).

■ Under the provisions of Article V, Sections and 10 and 11 of the Co-op's By-laws, if the circumstances enumerated therein were to exist, then the grace periods provided therein would inure to the benefit of the affected members absolutely; and, the Board of Directors would not be empowered to abrogate the affected members' rights to the grace periods by whatever manner of second guessing. The Board of Directors did not have the authority to terminate appellant's membership in the Co-op for at least one year following the loss or destruction of his vessel, and, under the facts of this case where a vessel was destroyed by "an act of God," the two year

limitation period would have been applicable.

Implicit in the trial court's judgment is the finding that appellant was not a member in good standing at the time the Co-op's assets were sold. Also implicit in the trial court's judgment is the finding that the Board of Directors acted correctly in terminating his membership. There is no evidence to support that conclusion. We sustain appellant's first point of error.

In his second point of error, appellant complains of the trial court's failure to file findings of fact and conclusions of law. In view of our disposition of appellant's first point of error, we are not of the opinion that appellant suffered prejudice in this regard so as to warrant either reversal or abatement.

■ In his third point of error, appellant complains of the trial court's failure to award him any portion of the proceeds of the sale of the Co-op's assets. We note that neither the Co-op's Charter and By-laws nor the Texas Cooperative Act, TEX. REV.CIV.STAT.ANN., art. 5737, et seq. (Vernon 1958), provide for the manner of distribution of net proceeds from sale of the Co-op's assets to holders of the Co-op's common stock. By necessary reference to this State's general corporations laws, the proceeds from the sale of the defunct Co-op's assets, subject to the right of creditors, rests in all of its stockholders in proportion to the amount of stock held by each. See *Sampson v. Scott*, 318 S.W.2d 22 (Tex.Civ.App.—Ft. Worth 1958, writ ref'd n.r.e.). Since we have determined above that appellant was a member in good standing at the time when the Co-op's assets were sold, we deem appellant entitled to his share of the net proceeds from the sale of the Co-op's assets in proportion to the amount of stock held by him. In sustaining appellant's third point of error, we reverse that portion of the judgment which decrees that appellant take nothing and render judgment for appellant in the amount of $38,261.01, his proportionate share of the net proceeds of the sale of the Co-op's assets, as prayed for in his brief on appeal.

In his fourth point of error appellant complains of the trial court's refusal to grant him attorney's fees. The parties stipulated what reasonable attorney's fees would be for appellant, including fees incurred in the appellate process, in the event he is entitled to recover them. We believe that he is.

■ As for a corporation and its shareholders, the relation between a cooperative and its stockholders is contractual in nature. See *Calvert v. Capital Southwest Corp.*, 441 S.W.2d 247 (Tex.Civ.App.—Austin 1969, writ ref'd n.r.e.), appeal dismissed 397 U.S. 321, 90 S.Ct. 1120, 25 L.Ed.2d 336 (1970); *Lennox v. Texas Cotton Cooperative Assoc.*, supra. Indeed, the status of shareholder has its origin in contract. See *McAlister v. Eclipse Oil Co.*, 92 S.W.2d 545 (Tex.Civ.App.—Beaumont 1936), reversed on other grounds 128 Tex. 449, 98 S.W.2d 171 (1936). Thus, appellant's cause of action is essentially one sounding *in contract;* and thus, attorney's fees are recoverable. TEX.REV.CIV.STAT.ANN. art. 2226 (Vernon Supp.1982–1983). Appellant's fourth point of error is sustained, and judgment is rendered that he have attorney's fees in the amounts stipulated by the parties.[3]

The judgment of the trial court is reversed and rendered that appellant is entitled to recover the sum of $38,261.00 representing of his one share of Co-op stock as well as attorney's fees in accordance with the stipulation between the parties. In addition, we grant appellant pre-judgment interest from 30 days after June 22, 1981 (the date of the sale of the Co-op) through September 10, 1982 (the date of the trial court's judgment) at the legal rate of six

3. $5,000.00 for trial of the cause, $5,000.00 for the appeal to the Court of Appeals, $2,500 for application of Writ of Error to the Texas Supreme Court, $2,500 if Writ of Error is granted by the Texas Supreme Court.

percent per annum.[4] TEX.REV.CIV.STAT. ANN. art. 5069–1.03 (Vernon Supp.1982); *Republic National Bank v. Northwest National Bank,* 578 S.W.2d 109 (Tex.1979); *Miles v. Royal Indemnity Company,* 589 S.W.2d 725 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). Furthermore, we grant post-judgment interest at the legal rate of nine percent per annum from the date of the trial court's judgment until paid. TEX.REV.CIV.STAT.ANN. art. 5069–1.05 (Vernon Supp.1982); *Thornal v. Cargill, Inc.,* 587 S.W.2d 384 (Tex.1979) (on motion for rehearing); Miles at p. 737. All costs of court are taxed against appellees.

---

**4.** Appellant is entitled to pre-judgment interest in the amount of $2,735.92 ($38,261.01 × 6% × 435/365 days = $2,735.92).