**CITY OF CORPUS CHRISTI,**
Texas, Appellant,

v.

**BAYFRONT ASSOCIATES,
LIMITED, Appellee.**

No. 13–90–101–CV.

Court of Appeals of Texas,
Corpus Christi.

June 18, 1991.

Rehearing Overruled Aug. 29, 1991.

James F. McKibben, Jr., Ken Fields, Hunt, Hermansen, McKibben & Barger, Corpus Christi, for appellant.

Cecil W. Casterline, Susan J. Gilbert, Ruth Ann Norton, Jennifer L. Weed, Bell, Boyd & Lloyd, Dallas, for appellee.

Susan M. Horton, Gen. Counsel, Cary L. Bovey, Asst. Gen. Counsel, Austin, Texas Municipal League and Texas Attys. Ass'n, for amicus curiae.

Before KENNEDY, DORSEY and HINOJOSA, JJ.

## OPINION

KENNEDY, Justice.

The City of Corpus Christi, Texas, ("the City") appeals a $2,416,176.00 judgment in favor of Bayfront Associates, Ltd., in Bayfront's suit for breach of contract and breach of fiduciary duty. The City raises nineteen points of error challenging the legal and factual sufficiency of the evidence to support the jury's verdict, the admission of certain evidence, the jury charge, and the trial court's award of prejudgment interest. We reverse the trial court's judgment.

This suit stems from a written agreement ("Lease") between the City and Bayfront concerning the lease by Bayfront of a portion of the bottom of Corpus Christi Bay which was owned by the City. Bayfront was to build a twelve-acre landfill on the leased bay bottom, to build improvements on the resulting "Landmass" and to sub-lease the Landmass to various retail and tourist related tenants, forming a commercial development referred to as a "festival market." The proposed "anchor" tenant of the Landmass was to be a large commercial aquarium ("Aquarium").[1] In order for the Landmass to be constructed, Bayfront needed to obtain government permits for its construction, including a permit issued by the United States Army Corps of Engineers ("Corps of Engineers"). According to the Lease between the City and Bayfront, the City was to assist in obtaining the permits. After some time, the Corps of Engineers issued a notice of intent to issue the permit but did not actually issue it. Subsequently, after a series of public controversies concerning the creation of the Landmass, including public opposition from at least one City Council member and an announcement that the Aquarium would be located elsewhere, the Corps of Engineers withdrew its notice of intent to issue the permit.

Bayfront brought suit against the City for breach of contract, contending that the City breached the express covenants contained in Articles 1.02 and 4.01(a) of the contract. Bayfront also contended its relationship with the City constituted a joint venture agreement or a partnership and that the City owed Bayfront a fiduciary duty. Bayfront brought a cause of action against the City for breach of its fiduciary duty and its duty of utmost good faith as a

---

1. The Aquarium exists today as the official Texas State Aquarium and is located on Corpus Christi Beach.

partner. Further, Bayfront contended that, as partners, it and the City shared a special relationship and that pursuant to that relationship, the City owed Bayfront a duty of good faith and fair dealing and that the City breached that duty. Bayfront specified which acts on the City's part constituted the breaches. Bayfront sought actual damages of $10,400,000.00, exemplary damages of $36,000,000.00, and attorneys' fees.

The City answered with general and specific denials. The City denied that it in any way breached the lease agreement between itself and Bayfront, that it repudiated the agreement, or that its conduct towards Bayfront was inconsistent in any way with the agreement. It further denied that any partnership or joint venture existed between it and Bayfront and that it therefore, did not owe a fiduciary duty or any duty of good faith. The City specifically denied each act listed by Bayfront in support of its contentions. The City also specifically denied each of Bayfront's allegations with regard to damages. The City also raised several affirmative defenses, including governmental immunity and the exceptions contained in the Texas Tort Claims Act, violations of the Texas Constitution, estoppel and waiver, contributory negligence, comparative causation and comparative responsibility.

The City contended that the unavailability of the permit resulted from a discretionary decision by an independent agency, namely, the Corps of Engineers. Additionally, the City contended that Bayfront had not exhausted its administrative remedies. The City also addressed Articles 1.02 and 4.01(a) of the agreement, outlined its interpretation of those articles, and contended that Bayfront's interpretation of them would be void and illegal.

After a jury trial, the trial court denied the City's motion for an instructed verdict, and the case went to the jury. The jury found that the City did breach the contract, that the City and Bayfront did enter into a partnership, that the City did breach its fiduciary duty, and awarded actual damages of $1,507,596.00. The jury awarded zero dollars to Bayfront for lost profits but awarded $242,657.00 in attorney's fees for trial, zero dollars in the event of appeal to the Court of Appeals and the Supreme Court, and zero dollars in exemplary damages. The trial court denied the City's motion for judgment notwithstanding the verdict and entered judgment on the jury verdict, additionally awarding statutory prejudgment interest. The City timely filed a motion for new trial which the trial court denied.

## A. BREACH OF CONTRACT

By its third point of error, the City contends that the trial court erred in submitting Jury Question No. 1, inquiring whether the City breached its contract with Bayfront, because, as a matter of law, none of the four acts which the jury was instructed to consider constituted a breach of contract. The contract which is the center of the controversy is the Lease between the City and Bayfront. Bayfront's petition specifically complained of the City's breach of Articles 1.02 and 4.01(a) of the Lease. These Articles are:

1.02 Lessee shall immediately herewith commence the preparation and filing of an application for the necessary and applicable Corps of Engineers permit, and this Lease Agreement is expressly conditioned upon receiving the express approval of all applicable federal, state and local governmental agencies of the proposed Land Mass and improvements thereon within eighteen (18) months of the date hereof. Upon request of Lessee, City agrees to promptly join in the application and use all diligence in assisting with obtaining all permits contemplated by this Lease Agreement, provided, that such applications are in conformity with the Plans and Specifications as approved in Article 7.

. . . .

4.01 Either party hereto may terminate this Lease Agreement, and the parties thereafter shall have no further obligation to each other hereunder if any one of the following conditions precedent are not met:

(a) failure to obtain a United States Army Corps of Engineers permit(s) ac-

cording to terms and conditions reasonably acceptable to City and/or Lessee. In connection therewith, Lessee shall exercise its best efforts to prepare and submit all applications necessary and required by the United States Army Corps of Engineers for said Permit(s), and City agrees, provided that such applications are in conformity with the Plans and Specifications as approved in Article 7, promptly upon request of Lessee to join, without cost to City, in the applications and assisting with obtaining said Permit(s).

Under article 1.02, upon Bayfront's request, the City had the duties (1) to join in the application and (2) to use all diligence in assisting with obtaining all permits contemplated by the Lease agreement. The Lease was signed on August 19, 1983.

█ In a breach of contract, the plaintiff must show the existence of a contract between the parties, that the contract created duties, that a breach of the duties occurred, and that the party sustained damages. *TCI Cablevision of Texas, Inc. v. South Texas Cable Television, Inc.*, 791 S.W.2d 269, 271 (Tex.App.—Corpus Christi 1990, writ denied). The parties do not dispute that the contract in question is the Lease. Furthermore, the parties do not dispute that, pursuant to the contract, Bayfront had a duty to use its best efforts to procure the permits and, upon request of Bayfront, the City had the duty to "join in the application and use all diligence in assisting with obtaining all permits."

Bayfront contended at trial and contends on appeal that the City breached the Lease (1) by failing to attend key meetings with the Corps of Engineers in Galveston, (2) by failing to respond to Councilmember Mary Pat Slavik's letters written on City stationery opposing the Landmass project, (3) by failing to give Bayfront advanced notice that the Aquarium Association was considering withdrawing from the Landmass, and (4) by providing significant financial support to encourage the Aquarium Association's move to another location. These four acts were included in the instruction accompanying Jury Question No. 1 regarding breach of contract.[2] In order for any of these acts to constitute a breach of contract, the City must have had the duties to (1) attend the key meetings with the Corps of Engineers in Galveston, (2) respond to Councilmember Mary Pat Salvik's letters written on City stationery opposing the Landmass project, (3) notify Bayfront that the Aquarium Association was considering withdrawing from the Landmass, or (4) not encourage the Aquarium to move to another location.

█ The City argues that the "assistance" language in the Lease does not include the duties and acts recited above but required only that the City take necessary formal, procedural steps in the permit process. The City also argues that the "assistance" language is not sufficiently definite to impose a legally enforceable duty on the City. We agree.

█ In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex.1987); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *Cambridge Oil Co. v. Huggins*, 765 S.W.2d 540, 543 (Tex. App.—Corpus Christi 1989, writ denied); *Corriveau v. 3005 Inv. Corp.*, 697 S.W.2d 766, 767 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). All provisions in a contract must be considered with reference to the whole instrument. *Coker*, 650 S.W.2d at 393; *First Victoria Nat'l Bank v. Briones*, 788 S.W.2d 632, 634 (Tex.App.—Corpus Christi 1990, writ denied); *Corriveau*, 697 S.W.2d at 767. If the written instrument is so worded that it can be given a certain definite meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *Coker*, 650 S.W.2d at 393; *Huggins*, 765 S.W.2d at 543; *Corriveau*, 697 S.W.2d at 767. A court should construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served. *Reilly*, 727 S.W.2d at 530.

**2.** The fourth act was listed in Jury Question No. 1 in a broader fashion, specifically: "The City's support, if any, of the Aquarium's move to Corpus Christi Beach."

Language used by parties in a contract should be accorded its plain, grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated. *Reilly*, 727 S.W.2d at 529; *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex.1985). When construing the terms of an instrument, we will presume that they will be given their plain, ordinary and generally accepted meanings unless the instrument itself shows them to have been used in a technical or different sense. *Milton v. Aransas Shrimp Co-op.*, 668 S.W.2d 735, 739 (Tex.App.—Corpus Christi 1983, writ dism'd). In determining the meanings of the words, we use the dictionary. *See Milton*, 668 S.W.2d at 739.

Black's Law Dictionary ("Black's") defines "assist" as to help; aid; succor; lend countenance or encouragement to; participate in as an auxiliary. BLACK'S LAW DICTIONARY 111 (5th ed. 1979). Black's further defines "assist" as to contribute effort in the complete accomplishment of an ultimate purpose intended to be effected by those engaged. *Id.* Webster's New Twentieth Century Dictionary Unabridged ("Webster's") defines assist as to help; to aid; to give support to in some undertaking or effort, or in time of distress. WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY UNABRIDGED 113 (2d ed. 1980). Webster's New Collegiate Dictionary ("Collegiate Dictionary") defines "assist" as to give support or aid; to give usual supplementary support or aid to. WEBSTER'S NEW COLLEGIATE DICTIONARY 67 (1981). The Collegiate Dictionary also designates "hamper" and "impede" as antonyms to "assist." *Id.*

Black's does not contain a definition of "hamper"; Black's defines "impede" as to obstruct; hinder; check; delay. BLACK'S LAW DICTIONARY at 678. Webster's defines "hamper" as to impede in motion or progress or to render progress difficult. WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY UNABRIDGED at 821. Webster's defines "impede" as to hinder; to stop in progress; to obstruct. *Id.* at 912. The Collegiate Dictionary defines "hamper" as to restrict the movement of by bonds or obstacles; to interfere with the operation

of; to hinder in moving, progressing or acting. WEBSTER'S NEW COLLEGIATE DICTIONARY at 514. "Impede" is defined in the Collegiate Dictionary as to interfere with or slow the progress of. *Id.* at 570.

Hence, in the context of the Lease, the City had the duty to use all diligence in helping, participating as an auxiliary, giving support to Bayfront's effort to get the required permits for the construction of the Landmass. The City further had a duty not to impede and not to hamper Bayfront's efforts and not to hinder or delay the progress of the permit application process or to render that progress difficult.

The City argues that the *ejusdem generis* rule of contract construction applies in this case and supports the contract interpretation that, at most, the contract required the City to provide acts of assistance similar to "joining" in the application, namely, taking other formal, procedural steps required in the permit process.

Bayfront counters that the doctrine of *ejusdem generis* is a rule of contract construction which provides that if general terms appear in a contract, they will be overcome and controlled by specific language dealing with the subject and that rule only applies when the parties' intention is not otherwise ascertainable. Bayfront argues that the rule has no application when the parties' intent is apparent. We agree. The doctrine of *ejusdem generis* applies when words of a specific and particular meaning are followed by general words and when an ambiguity exists; it does not apply when general words are followed by specific words. *See Jones v. St. Paul Ins. Co.*, 725 S.W.2d 291, 292 (Tex.App.—Corpus Christi 1986, no writ).

In this case, as noted above, the City had two separate duties: (1) to join in the application and (2) to use all diligence in assisting with obtaining all the permits contemplated by the lease. Assisting is limited to that associated with obtaining the permits. Since the terms of the Lease can be given ordinary grammatical definitions, we find no ambiguity and no need to use *ejusdem generis*.

Nevertheless, the extent to which the City was to assist Bayfront did have certain legal limits. As discussed below, the four acts or omissions which Bayfront contends were breaches of the Lease do not fall within the legal limits of the Lease.

### 1. Attendance at meetings in Galveston

It is undisputed that the City did not attend the Corps of Engineers meetings concerning the issuance of the permit for the Landmass, which were held in Galveston.

 Although a municipality does have the ability to contract with a private corporation, TEX. CONST. art. XI, § 5, TEX. LOCAL GOV'T CODE ANN. § 51.014 (Vernon 1988), it cannot appropriate or donate funds to that private corporation. TEX. CONST. art. XI, § 3. All business dealings with private corporations and associations are not prohibited, but municipal funds or credit may not be used simply to obtain for the community and its citizens the general benefits resulting from the operation of the corporation's enterprise. *Barrington v. Cokinos*, 161 Tex. 136, 338 S.W.2d 133, 140 (1960). On the other hand, an expenditure for the direct accomplishment of a legitimate public and municipal purpose is not rendered unlawful by the fact that a privately owned business may be benefitted thereby. *Barrington*, 338 S.W.2d at 140. Therefore, the extent of the City's assistance with regard to the construction of the Landmass, Bayfront's enterprise, was limited to that which did not require any expenditures. This limitation was recognized in the Lease in Article 4.01(a), which limited the City's assistance to that "without costs."

 This limitation on expenditures would directly affect the City's ability to attend the Corps of Engineers meetings in Galveston. Travel from Corpus Christi to Galveston is not cost free. Hence, since travel from Corpus Christi to Galveston would incur expense, the Lease cannot encompass an obligation on the part of the City to attend meetings in Galveston.[3] Therefore, Bayfront's contention that the City breached the Lease by failing to attend key meetings in Galveston is without merit.

### 2. Response to Mary Pat Salvik's letters

Mary Pat Slavik sent letters to the Corps of Engineers on the City stationery issued to her as a City Council member. Her letters expressed her strong opposition to the Landmass.

 A city council can affect the City's business only as a group. It is a well-settled rule that the governing authorities of cities can express themselves and bind the cities only by acting together in a meeting duly assembled. *Stirman v. City of Tyler*, 443 S.W.2d 354, 358 (Tex.Civ. App.—Tyler 1969, writ ref'd n.r.e.). A city council can transact a city's business transactions only by resolution or ordinance, by majority rule of the council. *Stirman*, 443 S.W.2d at 358; *First Nat. Bank of Marlin v. Dupuy*, 133 S.W.2d 238, 240 (Tex.Civ. App.—Waco 1939, writ dism'd, judg. cor.). A city can act by and through its governing body; statements of individual council members are not binding on the city. *Alamo Carriage v. City of San Antonio*, 768 S.W.2d 937, 941–42 (Tex.App.—San Antonio 1989, no writ). Similarly, an individual city council member's mental process, subjective knowledge, or motive is irrelevant to a legislative act of the city, such as the passage of an ordinance. *See Sosa v. City of Corpus Christi*, 739 S.W.2d 397, 405 (Tex.App.—Corpus Christi 1987, no writ).

 Mary Pat Slavik's opinions, even though inappropriately expressed on City stationery, could not and did not represent the City. The City had already acted through the majority of the council by entering the Lease and joining in the application by signing it. The City's position was already known to the Corps of Engineers, by its actions and public endorsements in favor of the Landmass. Since Mary Pat

---

**3.** The City did attend the Corps of Engineers public hearing in Corpus Christi and the mayor

and the majority of the City Council members spoke out strongly in favor of the Landmass.

Slavik's opinion could not be that of the City, we do not construe the Lease as obligating the City to react to the individual point of view of one of its council members. Councilwoman Slavik had the same First Amendment right to criticize the City's governmental policy and action as did other citizens and she cannot be sanctioned for her exercise of her First Amendment right. *See Bond v. Floyd*, 385 U.S. 116, 132–34, 87 S.Ct. 339, 347–49, 17 L.Ed.2d 235 (1966).

### 3. Notice to Bayfront that the Aquarium Association was considering withdrawing from the Landmass

As recognized in Article 9.01 of the Lease, at the time the Lease was written, the City and the Aquarium were negotiating regarding the construction and operation of the Aquarium on the Landmass. According to Article 9.01, the Aquarium Association had agreed, by letter, to move to the Landmass from the Aquarium's original proposed location if the Landmass was substantially complete within two years from the date of finalization of negotiation. Articles 9.02 and 9.04 contemplated a lease by the City from Bayfront of part of Tract Two for the proposed Aquarium. A conceptual design for the buildings to be put on the Landmass, including the Aquarium, was agreed upon by the City and Bayfront and incorporated by reference into the Lease (Articles 7.02 and 8.08(b)).

Articles 9.05 and 13.01 recognized, however, that the Aquarium was not a guaranteed tenant. Article 9.05 discussed the City's options for developing and leasing Tract Two (the proposed Aquarium site) from Bayfront in the event the Aquarium was not constructed on the Landmass. Article 13.01 discussed Bayfront's obligations regarding maintenance of the Landmass in general and any additional maintenance which would be required of Bayfront in the event the Aquarium was developed on the Landmass. Furthermore, Article 19, which generally dealt with default by the City, did not discuss or refer to, in any place, any obligation by the City to provide the Aquarium as the anchor tenant for the Landmass.

██ The City was not obligated to assist Bayfront in actually obtaining the Aquarium as a tenant; the City was only obligated to assist Bayfront in obtaining the required permits. With regard to the Aquarium, the City's only obligation was to lease the land for the Aquarium from Bayfront in the event the Aquarium was to be located on the Landmass. Although the Lease recognized that the Aquarium may be on the Landmass, the Lease also considered the creation and existence of the Landmass without the presence of the Aquarium. Furthermore, the thrust of the Lease and Bayfront's proposed use of the area was the creation of a commercial "festival market" with boat slips, not the creation of an Aquarium site.

Summarily, the Lease recognized the possibility that the Aquarium may not be located on the Landmass and, under the Lease, the City could lease the proposed Aquarium site for other purposes. Hence, we cannot say that the Lease was so dependent on the presence of the Aquarium that Bayfront was entitled to know the status of the City's negotiation with the Aquarium Association as part of the City's obligation to assist Bayfront in acquiring its permit from the Corps of Engineers. The clear meaning of the City's obligation to assist Bayfront in obtaining the permit would have included providing actual information regarding whether the Aquarium would be located on the Landmass only in the event the permit contemplated by the Lease was specifically for a Landmass with an Aquarium. Again, under the Lease, the City was only obligated to assist Bayfront in obtaining a permit for a Landmass on which the Aquarium may or may not have been located. Therefore, pursuant to the Lease, the City's obligation to assist Bayfront in obtaining the permit from the Corps of Engineers did not include giving Bayfront advanced notice that the Aquarium was considering withdrawing from the Landmass.

### 4. Provision of support for the Aquarium move

██ The support of which Bayfront complains was what it considered to be the

City's "significant financial support to encourage the Aquarium Association's move to another location," namely, the City's bond election and subsequent issuance of bonds which facilitated the Aquarium's move from the proposed Landmass location. No governmental agency can, by contract or otherwise, suspend or surrender its functions, nor can it legally enter into any contract which will embarrass or control its legislative powers and duties or which will amount to an abdication thereof. *Nairn v. Bean*, 121 Tex. 355, 48 S.W.2d 584, 586 (Comm'n App.1932, opinion adopted); *Bowers v. City of Taylor*, 16 S.W.2d 520, 521 (Tex.Comm'n App.1929, holding approved); *City of Teague v. Sheffield*, 26 S.W.2d 417, 419 (Tex.Civ.App.—Waco 1930, no writ). In its dealings with the City, Bayfront was charged with notice of the City's charter provisions with regard to the scope of its powers, duties, and functions. *Alamo Carriage v. City of San Antonio*, 768 S.W.2d 937, 942 (Tex.App.—San Antonio 1989, no writ); *see also Wilson v. County of Calhoun*, 489 S.W.2d 393, 397 (Tex.Civ. App.—Corpus Christi 1972, writ ref'd n.r.e.). One of the governmental functions of the City is to issue bonds upon approval by a majority vote of the qualified voters of the city voting at an election called specifically for such purpose. CORPUS CHRISTI, TEX., CHARTER art. VIII, § 2(a) & (b). As a matter of law, under the contract, the City's obligation to assist Bayfront could not include a preclusion from holding the bond election and subsequently issuing the bonds. Such a broad reading of the contract would contravene the well-established law of the State of Texas. Moreover, we recognize that the City did not provide the financial support for the Aquarium to move, the citizens of Corpus Christi authorized the support by voting to approve the issuance of the bonds for that purpose.

We conclude that the four acts which Bayfront contends constituted a breach of the Lease were not acts which the City was obligated to perform pursuant to the terms of the Lease. Therefore, as a matter of law, there was no breach of contract by the City and Jury Question No. 1 should not

have been submitted to the jury. We sustain the City's third point of error.

## B. PARTNERSHIP AND FIDUCIARY DUTY

In this case, Bayfront brought suit on the alternative theories of recovery of breach of contract and breach of fiduciary duty. The submitted question regarding damages, Jury Question No. 4, was conditioned on a finding of either a breach of contract or a breach of fiduciary duty. As explained above, there was no breach of contract as a matter of law. Therefore, damages could only have been awarded, if at all, as a result of a breach of fiduciary duty. A finding of a breach of fiduciary duty follows from the existence of a partnership.

In part of its fourth point of error, the City contends that the trial court erred in submitting Jury Question No. 3, inquiring whether the City committed a breach of fiduciary duty because, as a matter of law, none of the four specific acts that the jury was instructed to consider in answering the Question could constitute a breach of fiduciary duty to Bayfront. We first examine the Lease to determine whether a partnership existed between the City and Bayfront, or legally could exist, such that a fiduciary duty could be created.

"A partnership is an association of two or more persons to carry on as co-owners of a business for profit." TEX.REV. CIV.STAT.ANN. art. 6132b, § 6(1) (Vernon 1970). This relationship must be based on an agreement, either expressed or implied. *Coastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 287 (Tex.1978). Here, there is no express agreement between the parties to be a partnership or to form a partnership. Therefore, for a partnership to exist, the agreement must be implied from the relationship of the parties. The relationship must contain four essential elements before an agreement to be partners can be implied: (1) an agreement to share profits, (2) an agreement to share losses, (3) a mutual right of control or management of the business, and (4) a community of interest in the venture. *Ayco Dev.*

*Corp. v. G.E.T. Serv. Co.,* 616 S.W.2d 184, 186 (Tex.1981); *Micrea,* 572 S.W.2d at 287. The intention of the parties to a contract is a prime element in determining whether a partnership exists. *Micrea,* 572 S.W.2d at 287.

■ Bayfront asserts that the Lease provision that the City was to receive rents from Bayfront for the use of the land and that the rent was to be calculated as a percentage of the gross revenues was an agreement to share profits. The City contends that this was not an agreement to share profits. "The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no inference shall be drawn if such profits were received in payment ... as rent to a landlord." TEX.REV.CIV.STAT. ANN. art. 6132b § 7(4)(b) (Vernon 1970); *see* Ogus, *Rabinovich & Ogus Co. v. Foley Bros. Dry Goods Co.,* 252 S.W. 1048, 1049 (Tex.Comm'n App.1923, judgm't adopted). We agree with the City.

■ Bayfront contends that the Lease does provide that the City and Bayfront would share cost and expenses needed to finance the project. The City is correct when it contends that there was no agreement to share losses. A failure by the parties to agree to share losses precludes implying the existence of a partnership. *See Gutierrez v. Yancey,* 650 S.W.2d 169, 172 (Tex.App.—San Antonio 1983, no writ). A review of the Lease shows that it contains an agreement by the City to pay rent to Bayfront for the area of the Landmass on which the Aquarium may have been located and an acknowledgment that the City and Bayfront anticipated that financing would be through the issuance of bonds which the City agreed to help Bayfront obtain. Neither of these is an agreement to share losses.

■ With regard to a mutual right of control or management of the business, Bayfront asserts that the Lease provided that both parties would exercise control over the project. As the City points out, the City's rights of control pursuant to the Lease were limited to its related interests as lessor, as the owner of the underlying fee and adjacent streets and marina, and as a city whose codes and ordinances regarding construction must be met. Such control is not mutual control.

■ Bayfront states that, by virtue of their relationship as enumerated in the Lease, Bayfront and the City shared a community of interest in the Landmass. We disagree. Although the Lease indicates that both the City and Bayfront were interested in the development of the Landmass, the Lease terms indicate that Bayfront was pre-occupied with the generation of profits through the subleasing of space on the Landmass to various vendors, while the City was interested in the Landmass as part of the City's "Reinvestment Zone Number One," which was for the development of the City's Central Business District and Marina and for the revitalization of the City's downtown area and Corpus Christi Beach for the benefit of City residents and visitors. In other words, as indicated by the Lease, Bayfront considered the Landmass an end in itself and the City considered the Landmass as a means to an end greater than the Landmass itself. *See Hasslocher v. Heger,* 670 S.W.2d 689, 693 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.). The City and Bayfront did not share a community of interest in the Landmass. We conclude, under the terms of the Lease, that no partnership existed as a matter of law between Bayfront and the City.

■ Despite the terms of the lease, Bayfront asserts that the most important evidence of the existence of a partnership between it and the City are admissions by the City that a partnership existed and that these are evidence of the intentions of the City and Bayfront. Specifically, Bayfront recites Mayor Luther Jones' reference, in a letter, to Bayfront as the "private partner" of the City. Additionally, Bayfront relies on references made by other City representatives to Bayfront as the City's "partner." Whether these people actually referred to Bayfront as the City's partner is not determinative of the legal relationship

of whether a partnership existed vel non.[4] We hold that no partnership existed under the terms of the Lease.

Since there was no partnership between the City and Bayfront, as a matter of law, there could be no breach of fiduciary duty. Therefore, Jury Question No. 3 should not have been submitted to the jury. We sustain the City's fourth point of error.

Our disposition of the City's third and fourth points of error requires that the judgment of the trial court be reversed and judgment here rendered that Bayfront take nothing in its suit. We need not address the City's remaining points of error.

---

**4.** In other words, a duck which is called a horse does not become a horse; a duck is a duck.