

## KEN PAXTON
### ATTORNEY GENERAL OF TEXAS

May 20, 2023

The Honorable Paul Bettencourt
Chair, Senate Committee on Local Government
Texas State Senate
Post Office Box 12068
Austin, Texas 78711-2068

**Opinion No. KP-0444**

Re: Whether a tax rate increase election under Tax Code section 26.07 authorizes a municipality to "earmark" use of a voter-approved increase in its Maintenance and Operation property tax revenue for purposes other than maintenance or operations; and if not, may an increase in a municipality's Maintenance and Operation property tax be transferred to a local government corporation (created pursuant to Transportation Code chapter 431, subchapter D) to be used for debt service on debt issued by the local government corporation (RQ-0508-KP)

Dear Senator Bettencourt:

You ask two questions related to the City of Austin's use of its maintenance and operations tax collections to pay for debt service.[1] As background you tell us that in 2020 the City of Austin ("City") adopted a tax rate higher than the voter-approval tax rate, which triggered an election under Tax Code section 26.07. Request Letter at 1. You state that before the tax-rate increase election in November of that year "the Austin City Council adopted a Resolution, as distinguished from an ordinance, that the Council called a 'contract with the voters.'" *Id.* You recite from the Resolution the City's statement that:

> The City Council, by this official action, clarifies and declares its intent and commitment to the voters to create a contract with the voters that specifies and commits that the proceeds from the Project Connect Tax Revenue collected shall be used to invest in a citywide rapid transit system, known as Project Connect, which includes associated transit-supportive anti-displacement strategies.

---

[1]*See* Letter from Honorable Paul Bettencourt, Chair, Senate Comm. on Loc. Gov't, to the Off. of the Att'y Gen., Op. Comm. at 1 (May 10, 2023), https://texasattorneygeneral.gov/sites/default/files/requestfiles/request/2023/RQ0508KP.pdf ("Request Letter").

*Id.* You tell us that Austin voters approved an additional $0.0875-cent property tax rate increase in the election, or an amount "equivalent to 20.789% of the City's General Fund (Maintenance and Operation) property tax revenue in 2020." *Id.* at 2. You further tell us that the same percentage was "the amount of the City's M&O property tax revenue that would be transferred each year in perpetuity from the City to the Austin Transit Partnership Local Government Corporation (ATP), a nonprofit entity created to fund and implement Project Connect using the property tax revenue transferred from the City." *Id.* Lastly, you tell us the "intent is for ATP to issue some form of debt, *e.g.*, revenue bonds, to pay for Project Connect infrastructure engineering and construction." *Id.*

In this context you ask:

> In a tax-rate increase election held pursuant to Tex[as] Tax Code section 26.07, the ballot must include a description of the "purpose" of the increase. Does section 26.07 authorize a municipality to "earmark" use of a voter-approved increase in its Maintenance and Operation property tax revenue for purposes other than maintenance or operation, *e.g.*, debt service?

> If not, can such an increase in a municipality's Maintenance and Operation property tax be transferred to a local government corporation (created pursuant to Tex[as] Trans[portation] Code Chapter 431, Subchapter D) to be used for debt service on debt issued by the local government corporation?

*Id.*

**Tax Code section 26.07 requires a tax-rate increase election when certain conditions are met—it does not "authorize" any expenditure of tax revenue not otherwise allowed by law.**

You first ask whether Tax Code section 26.07 "authorizes" a municipality to "earmark" a voter-approved increase in its maintenance and operation property tax revenue for purposes other than maintenance or operation. *See id.*

Section 26.07 requires an election when a municipality with a population of more than 30,000 adopts a tax rate[2] increase exceeding the municipality's voter-approval tax rate—the maximum rate allowed by law without voter approval. TEX. TAX CODE §§ 26.07(b), .04(c)(2). This section prescribes ballot language a municipality must use for the voter-approval election, including a requirement that the municipality describe the purpose for the proposed tax increase. *Id.* § 26.07(c). Section 26.07 does not place substantive restrictions on the purpose chosen by the municipality for a proposed increase. *See id.* As such, section 26.07 does not "authorize" any particular method of expenditure of tax revenue due to the increased tax rate—it merely requires

---

[2]If a taxing entity adopts a tax rate greater than the voter-approval tax rate, an automatic election is triggered. TEX. TAX CODE § 26.07(a). Only with the voters' approval does the new proposed rate take effect. *Id.* § 26.07(d). If the voters reject the proposed rate, the entity must adopt the voter-approval tax rate. *Id.* § 26.07(e).

a tax-rate increase election when certain conditions are met.[3] A municipality remains bound by all applicable constitutional and statutory limitations on the expenditure of tax revenue generated by an increase that necessitated a tax-rate election. Accordingly, section 26.07 itself neither authorizes nor restricts a municipality from "earmarking" an increase in its maintenance and operations tax for "other purposes" including "debt service."

**Maintenance and operations tax revenue generally may not be applied toward debt service.**

However, we note that chapter 26 separately defines "[m]aintenance and operations" as "any lawful purpose *other than debt service* for which a taxing unit may spend property tax revenues." *Id.* § 26.012(16) (emphasis added); *see also id.* § 26.04(c)(2)(B); *Gilbert v. El Paso Cnty. Hosp. Dist.*, 38 S.W.3d 85, 88 (Tex. 2001). "Debt" and "[d]ebt service" also are defined terms under chapter 26, with the latter defined as "the total amount expended or to be expended by a taxing unit from property tax revenues to pay principal of and interest on debts or other payments required by contract to secure the debts . . . ." TEX. TAX CODE § 26.012(8). Accordingly, "maintenance and operations" and "debt service" are two separate and distinct components on which the voter-approval tax rate—the proposed tax rate that triggers an election under section 26.07—is calculated.[4] These definitions generally answer your question whether maintenance and operations tax revenue may be used "for purposes other than maintenance or operation, *e.g.*, debt service."[5] Request Letter at 2. Barring express statutory authority, maintenance and operations tax revenue must be used for "[m]aintenance and operations" as defined by statute, which expressly excludes debt service as defined by subsection 26.012(8). *See* TEX. TAX CODE § 26.012(16).

For these reasons, section 26.07 does not authorize a municipality to "earmark" use of a voter-approved increase in its maintenance and operation property tax revenue for debt service as defined in section 26.07.[6]

---

[3]You do not ask about what other authority the City might be invoking, and we do not offer an opinion beyond the provisions you specifically identify in your request letter.

[4]The voter-approval tax rate formula is:

VOTER-APPROVAL TAX RATE = (NO-NEW REVENUE MAINTENANCE AND OPERATIONS RATE x 1.035) + (CURRENT DEBT RATE + UNUSED INCREMENT RATE)

TEX. TAX CODE § 26.04(c)(2)(B); *see also id.* §§ 26.012(18) (defining "[n]o-new revenue maintenance and operations rate"), 26.013(b) (defining "unused increment rate").

[5]We recognize that in 2021, in House Bill 1869, the Legislature narrowed the definition of "[d]ebt" in subsection 26.012(7) such that certain unvoted tax obligations lawfully issued for purposes other than designated infrastructure must be accounted for under the maintenance and operations portion of the tax rate and are made subject to the maintenance and operations revenue cap. *See* Tex. H.B. 1869, 87th Leg., R.S. (2021). Thus, when we say that maintenance and operations tax revenue generally may not be used for debt service, we mean for "[d]ebt service" as such term is defined in subsection 26.012(8). *See* TEX. TAX CODE § 26.012(8).

[6]As this conclusion is dispositive, and given the expedited nature of your request, we do not lay out other potential lines of legal analysis reaching the same conclusion.

**An agreement wherein a municipality obligates itself to transfer an increase in its maintenance and operations property tax is prohibited by article XI, section 5 as an impermissible pecuniary obligation imposed by contract.**

You also ask whether the municipality may transfer maintenance and operations tax revenue generated from a voter-approved tax-rate increase to a local government corporation ("LGC") created pursuant to Transportation Code chapter 431, subchapter D, to be used for debt service on debt issued by the LGC. Request Letter at 2.

Under Transportation Code chapter 431, a "[l]ocal government corporation" is "a corporation incorporated as provided by Subchapter D to act on behalf of a local government." TEX. TRANSP. CODE § 431.003(4); *see also id.* § 431.003(3) (defining "[l]ocal government" to include a municipality). Section 431.101 states that a "local government corporation may be created to aid and act on behalf of one or more local governments *to accomplish any governmental purpose of those local governments*." *Id.* § 431.101(a) (emphasis added). An LGC has the powers and privileges of a nonprofit corporation,[7] including the authority to issue bonds and notes to carry out its purposes.[8] *See id.* §§ 431.062(a) (providing for the powers of a transportation corporation created by the Transportation Commission), 431.101(b) (providing that an LGC has the powers of a transportation corporation authorized for creation by the Transportation Commission), 431.070(a) (authorizing a transportation corporation to issue debt); *see also* TEX. BUS. ORGS. CODE §§ 22.101–.109 (subchapter C, governing the formation and governing documents of a nonprofit corporation). And relevant to your question, a LGC and a political subdivision have express authority to contract with each other. *See* TEX. TRANSP. CODE §§ 431.103, .105(a). Thus, current statutes do not expressly prohibit a municipality from transferring funds to an LGC. *But see* TEX. CONST. art. III, § 52(a) (prohibiting political subdivisions from a gratuitous expenditure of public funds).

However, the Texas Constitution imposes limitations on a municipality's authority to contract with an LGC to the extent the contract obligates the municipality to a debt. Outside of chapter 26, Texas Constitution, article XI, subsection 5(a) prohibits a city from creating debt without also levying and collecting a sufficient tax and creating a sinking fund of at least two percent. *Id.* art. XI, § 5(a). For purposes of this provision, "debt" means "any pecuniary obligation imposed by contract[.]" *McNeill v. City of Waco*, 33 S.W. 322, 324 (Tex. 1895); *Tex. & New Orleans R.R. Co. v. Galveston Cnty.*, 169 S.W.2d 713, 715 (Tex. 1943). A contract does not create a debt if the parties lawfully and reasonably contemplate when the contract is made that the obligation will be satisfied out of current revenues for the year, or out of some fund then within the immediate control of the governmental unit. *See McNeill*, 33 S.W. at 324; *City of Bonham v. Sw. Sanitation, Inc.*, 871 S.W.2d 765, 768 (Tex. App.—Texarkana 1994, writ denied). A "contract

---

[7]ATP is also incorporated under chapter 22 of the Texas Business Organizations Code. *See Articles of Incorporation of Austin Transit Partnership Local Government Corporation*, AUSTIN TRANSIT PARTNERSHIP, https://www.atptx.org/docs/librariesprovider3/about/governing-docs/6-atp-articles-of-incorporation.pdf.

[8]Transportation Code chapter 431 authorizes the creation of a corporation and a local government corporation. *See* TEX. TRANSP. CODE § 431.003(2), (4) (defining a "[c]orporation" and a "[l]ocal government corporation"); *see also id.* §§ 431.021–.034 (subchapter B, providing for corporations), 431.101–.110 (subchapter D, providing for local government corporations). To distinguish the two types of corporations, we refer to a corporation created by the Transportation Commission as a transportation corporation.

which runs for more than one year is a commitment only of current revenues, and so is *not* a 'debt,' *if* it reserves to the governing body the right to terminate at the end of each budget period." *City-Cnty. Solid Waste Control Bd. v. Cap. City Leasing, Inc.*, 813 S.W.2d 705, 707 (Tex. App.—Austin 1991, writ denied) (first emphasis added). Thus, an agreement wherein a municipality obligates itself to transfer an increase in its maintenance and operations property tax is prohibited by article XI, section 5 as an impermissible pecuniary obligation imposed by contract.

> **The City of Austin's purported "contract with the voters" covenants are prohibited by article XI, section 5 as a pecuniary obligation imposed by contract.**

This office does not generally construe contracts, but we can address a public entity's authority to agree to a particular contract term as a matter of law and whether a particular contract provision is invalid as a matter of law. *See* Tex. Att'y Gen. Op. No. GA-0078 (2003) at 2. ATP argues that the annual transfer of Project Connect Tax Revenues is made only after it is reviewed and approved by the city council as part of the City's annual budget process.[9] Hence, ATP argues that each such annual transfer of Project Connect Tax Revenues is a lawful expenditure of maintenance and operations tax revenue that is subject to annual appropriation.[10] However, the following language in the City's Resolution purports to commit the Project Connect Tax Revenues beyond the annual appropriation period:

> Upon voter approval of the tax rate, beginning in Fiscal Year 2020-21, the City Manager is directed to transfer the Project Connect Tax Revenue to Austin Transit Partnership. Further the City Manager is directed to include in the Joint Powers Agreement with Austin Transit Partnership, a procedure to transfer the Project Connect Tax Revenue in a proportionate amount on an annual or more frequent basis. *The transfer of the Project Connect Tax Revenue will continue until such time as all debt issued and financial obligations incurred by Austin Transit Partnership are paid off and funds are no longer required for operations, maintenance, or state of good repair for assets funded by Austin Transit Partnership.*[11]

Resolution at 5 (footnote and emphasis added). In addition to the Joint Powers Agreement noted above, ATP also references in its briefing an Interlocal Agreement between the City and ATP that was executed in August of 2021.[12] Section 2A of the Interlocal Agreement states: "The City [of

---

[9]*See* Brief from McCall Parkhurst, McCall, Parkhurst & Horton L.L.P, to Honorable Ken Paxton, Tex. Att'y Gen. at 2 (May 17, 2023) (on file with the Op. Comm.) However, nothing in the Interlocal Agreement makes the payments of Project Connect Tax Revenues subject to the budgeting process. Instead, there is a covenant that the City of Austin will have the city manager include the amount in the proposed budget. On its face, if the City of Austin does not pay the Project Connect Tax Revenues to ATP, the City of Austin is in breach of the Interlocal Agreement.

[10]*Id.*

[11]*See* https://www.austintexas.gov/edims/document.cfm?id=346090.

[12]*See* Brief from Robert M. Collier, Jr., GreenbergTraurig, to Honorable Ken Paxton, Tex. Att'y Gen. at 1 (May 17, 2023) (on file with Op. Comm.); Joint Powers Agreement with Interlocal Agreement, Attachment D, https://www.austintexas.gov/edims/document.cfm?id=370413 ("Attachment D").

Austin] shall make payments of annual [Project Connect] Tax Revenue to ATP through the term of this Agreement according to the following schedule[.]" Attachment D at 4. In no place does the Interlocal Agreement make such payment subject to the city budgeting process. Instead, a covenant from the City of Austin to ATP states that

> the term of this agreement, as authorized and directed by the voters and council, in the November 2020 election and the Contract with the Voters, the City Manager will provide a budget for council adoption that provides the appropriate proportionate share of the City's M&O tax rate following the calculations and procedures in this Agreement, specifically section 2A of this Agreement.

*Id.* at 5–6.

The Interlocal Agreement defines the term of the agreement as follows:

> A: Term
>
> This agreement shall remain in place from date of execution until the earlier of:
>
> 1)  The date all debt issued and financial obligations incurred by Austin Transit Partnership are paid off and funds are no longer required for operations, maintenance, or state of good repair for assets funded by ATP; or
>
> 2)  The dissolution of ATP, in accordance with state law.

*Id.* at 6.

The above provisions in both the Interlocal Agreement and the Resolution[13] run counter to the assertion that the annual transfers are truly meant to be subject to annual appropriation.[14]

---

[13]Assuming arguendo that ATP is correct that the City's obligation to transfer maintenance tax revenues under the agreement is truly subject to annual appropriation, we would further note that in order to comply with applicable securities laws, the offering documents would be required to include disclosure to the effect: "All statements made in the Project Connect Resolution to secure voter approval of its increase in maintenance tax revenues in order to fund Project Connect and repay the securities being offered hereby that in anyway imply that the City does not have a right to terminate under the agreement at the end of each budget period is incorrect and may not be relied upon. There can be no assurance as to the impact of these misstatements, but they could be material and could result in payment default."

[14]While it is clear that what the Resolution and the Interlocal Agreement attempt to do is invalid as a matter of law when in creating ATP it attempted to commit funds to ATP in essence in perpetuity, the City of Austin and ATP point to a savings clause in the Resolution that says the Project Connect Plan and financing is to be modified as necessary to comply with Federal and State laws. *See supra* note 8 and 11. But it also has a third condition: the

(continued…)

To the extent any term or agreement obligates the City to transfer to its LCG the increased maintenance and operations tax revenue over a multi-year period without the ability to terminate at the end of each budget period, such a term or agreement violates article XI, section 5 of the Texas Constitution. Under particular facts, a court could find that the City essentially encumbered the tax revenue for more than one year and did not "reasonably contemplate" that the obligation would be made out of revenue available at the time the City entered into an agreement. *See* Tex. Att'y Gen. Op. No. GA-0652 (2008) at 4 (recognizing that current revenue is that existing at the time the contract is executed); *see also* Tex. Att'y Gen. Op. No. JC-0335 (2001) at 7 ("No governmental agency can, by contract or otherwise, suspend or surrender its functions, nor can it legally enter into any contract which will embarrass or control its legislative power and duties or will amount to an abdication thereof." (quoting *City of Corpus Christi v. Bayfront Assocs., Ltd.*, 814 S.W.2d 98, 107 (Tex. App.—Corpus Christi-Edinburg 1991, writ denied)).

---

financing is to be modified as necessary to comply with conditions imposed by the Attorney General of the State of Texas. *See id.* There are no limitations in the Resolution on what conditions in the Attorney General may impose (other than those limitations as imposed by the Constitution and applicable statutes). In other words, if necessary to get the financing done, the financing would not just be subject to the authority of the Public Finance Division, but also the Attorney General's authority to regulate corporations like ATP generally under the Constitution, but also the specific authority the Attorney General has to regulate not-for-profit corporations. Whether the Attorney General can come up with a way to reform ATP to make it legal is beyond the scope of this opinion. Until the Attorney General's applicable divisions see the complete plan as how the City of Austin and ATP intend to correct the mistakes they made in the Resolution, Interlocal Agreement, and their misstatements to the voters of Austin, it is unknown whether the Attorney General will be able to impose sufficient conditions to remedy all the mistakes that have been made.

## S U M M A R Y

A truth-in-taxation provision, Texas Tax Code section 26.07 requires a municipality to hold an automatic election if it seeks to increase its tax rates above a specified amount. It does not authorize a municipality to "earmark" use of a voter-approved increase in its maintenance and operation property tax revenue for debt service.

A court would likely conclude that an agreement wherein a municipality binds itself to transfer in perpetuity an increase in its maintenance and operations property tax and is not subject to an annual appropriation and is prohibited by article XI, section 5 as a pecuniary obligation imposed by contract with no right to terminate at the end of each budget period.

Very truly yours,

KEN PAXTON
Attorney General of Texas


BRENT WEBSTER
First Assistant Attorney General

LESLEY FRENCH
Chief of Staff

D. FORREST BRUMBAUGH
Deputy Attorney General for Legal Counsel

AUSTIN KINGHORN
Chair, Opinion Committee